[Cite as *In re M.R.*, 2013-Ohio-1302.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### DEFIANCE COUNTY

IN THE MATTER OF:

    M.R.

A DEPENDENT CHILD,

[KIMBERLY PANNELL -  APPELLANT],
[DAVID RATLIFF -  APPELLANT].

CASE NO.  4-12-18

O P I N I O N

Appeal from Defiance County Common Pleas Court
Juvenile Division
Trial Court No. 30252

**Judgment Affirmed**

Date of Decision:   April 1, 2013

APPEARANCES:

    *Jeffrey J. Horvath* for Appellant, David Ratliff

    *Timothy C. Holtsberry*  for Appellant, Kimberly Pannell

    *Russell R. Herman*  for Appellee, State of Ohio

    *Katrina M. Kight*  Guardian Ad Litem

**SHAW, J.**

{¶1} Mother-appellant, Kimberly Pannell ("Kim"), and father-appellant, David Ratliff ("David"), appeal the July 30, 2012 judgment of the Defiance County Juvenile Court granting permanent custody of their child, M.R., to the Defiance County Department of Job and Family Services, ("the Agency").

{¶2} On October 13, 2010, Kim gave birth to M.R. while Kim was an inmate at the Ohio Reformatory for Women. On the same day, the Agency filed an emergency ex-parte order requesting emergency custody of M.R, which the trial court granted. M.R. was placed with foster-to-adopt parents who picked her up from the hospital after the delivery. [1]

{¶3} On October 20, 2010, the Agency filed a complaint, alleging M.R. to be a dependent child as defined in R.C. 2151.04(A),(C) and requested that M.R. be placed in the temporary custody of the Agency or in the alternative legal custody be granted to a suitable relative. As the grounds for the complaint, the Agency alleged that M.R. was "homeless or without adequate parental care through no fault of her parents and/or her condition or environment was such as to warrant the State, in the interests of the child, in assuming the child's guardianship." (Complaint at 2). The complaint specified that the child's mother, was currently

---

[1] The record indicates that Kim was initially approved to participate in the ABC Nursery program, which would have allowed her to keep M.R. with her while she served the remainder of her prison sentence. Prior to M.R.'s birth, Kim withdrew from the ABC program and enrolled in the Intensive Prison Program, through which she could earn early release from prison upon successful completion of the program, but could no longer keep M.R. with her in prison.

incarcerated and M.R.'s putative father had yet to be legally established as her biological father.

{¶4} On November 18, 2010, a hearing was held before the trial court. David appeared on his own behalf as M.R.'s putative father. Kim remained incarcerated. The Agency represented to the trial court that it was exploring suitable relative placements.

{¶5} On November 22, 2010, the trial court appointed a Guardian ad-litem ("GAL") to the case.

{¶6} On December 6, 2010, David was legally established as M.R.'s biological father. On the same day, the trial court issued a judgment entry finding that it was in M.R.'s best interest to remain in the temporary custody of the Agency.

{¶7} On February 1, 2011, the parties appeared for a hearing. Kim had been recently released from prison. Kim and David entered a plea of "not true" to the allegations contained in the Agency's complaint. The parties agreed that it was in M.R.'s best interest to continue the Agency's temporary custody.

{¶8} On March 23, 2011, the Agency filed a case plan addressing its concerns with Kim and David's ability to provide for M.R.'s basic needs on a regular and ongoing basis. The case plan set forth specific objectives for Kim and David to develop a stable environment for their family.

{¶9} On May 31, 2011, after a hearing, the trial court found by clear and convincing evidence M.R. to be a dependent child and adjudicated her as such.

{¶10} On June 28, 2011, the trial court held the dispositional hearing. In its July 8, 2011 Judgment Entry, the trial court stated that the parties agreed that it was in the best interests of M.R. to continue the Agency's temporary custody, and accordingly, ordered M.R. to remain in the temporary custody of the Agency.

{¶11} Both Kim and David appealed, challenging the trial court's finding of dependency and specifically asserting that the Agency failed to meet its burden in establishing that it had used reasonable efforts to prevent M.R.'s continued removal from the home. *See In re M.R. I*, 3d Dist. No. 4-11-12, 2011-Ohio-6528, ¶ 9. This Court overruled Kim's and David's assignments of error and affirmed the trial court's finding of dependency, concluding that the Agency used reasonable efforts and that the judgment of the trial court was supported by clear and convincing evidence. *Id*. at ¶¶ 17-19.

{¶12} On September 26, 2011, the Agency filed a motion to extend temporary custody of M.R. on the grounds that Kim and David had not yet completed the objectives in the case plan and their lives continued to be unstable. The Agency's motion requested an additional six months of temporary custody to allow Kim and David time to show compliance with the case plan.

{¶13} On October 4, 2011, the parties appeared before the trial court for the annual review of the case and the Agency's motion to extend temporary custody. On October 6, 2011, the trial court issued a judgment entry granting the Agency's motion and extending the Agency's temporary custody of M.R. for an additional six months.

{¶14} On March 20, 2012, the Agency filed a motion for permanent custody. As the grounds for the motion, the Agency alleged that:

> **[M.R.] has been in the temporary custody of the Agency for over twelve (12) of the past twenty-two (22) consecutive months. The parents have been working on some of the case plan objectives but have failed to make the changes necessary to provide a stable home for M.R. Recently, a second child was removed from the parents in Williams County, due to an incident in that county, and the Agency believes that it is in this child's best interest to be placed in the permanent custody of the Agency so that she may be made available for adoption, as she needs a legally secure, safe, stable home.**

(Mot. Mar. 20, 2012 at 2).

{¶15} On April 25, 2012, Kim filed a "Motion for Expansion of Companionship Time or in the Alternative Motion to Return the Child." In this motion, Kim alleged that she had substantially complied with case plan and that the Agency had failed to allow her expanded and/or unsupervised companionship with M.R.

{¶16} On May 2, 2012, an initial hearing was held. The judgment entry following the hearing indicates that the parties "agreed that it is in the best interest

of the child that she remain in the temporary custody of the Agency pending further hearing in the matter[.]" (JE, May 9, 2012 at 1).

{¶17} On June 21, 2012, the GAL filed a report recommending that permanent custody of M.R. be granted to the Agency.

{¶18} On July 2, 2012, the trial court conducted an evidentiary hearing on the Agency's motion for permanent custody. Several witnesses testified, including Kim and David.

{¶19} On July 30, 2012, the trial court issued a judgment entry making numerous factual findings, including that the evidence established that M.R. has been in the foster care for more than twelve of the past twenty-two months. *See* R.C. 2151.414(B)(1)(d). The trial court also found by clear and convincing evidence that it was in M.R.'s best interest to grant the Agency's motion for permanent custody and thus, terminated Kim and David's parental rights, responsibilities and privileges.

{¶20} Kim and David now appeal, each asserting the following assignments of error.

### KIM'S ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED WHEN THERE WAS NOT A FINDING BY CLEAR AND CONVINCING EVIDENCE THAT ONE OF THE STATUTORY FACTORS IN R.C. 2151.414(E) WERE [SIC] MET BEFORE GRANTING PERMANENT CUSTODY TO THE AGENCY.**

**KIM'S ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED WHEN THERE WAS NOT A FINDING BY CLEAR AND CONVINCING EVIDENCE THAT THE STATUTORY FACTORS IN R.C. 2151.414(D) WERE MET BEFORE GRANTING PERMANENT CUSTODY TO THE AGENCY.**

**KIM'S ASSIGNMENT OF ERROR NO. III**

**THE TRIAL COURT ERRED GRANTING PERMANENT CUSTODY TO THE AGENCY WHEN THE INITIAL CAUSE OF DEPENDENCY WAS REMEDIED AND THE CASE PLAN HAD BEEN SUBSTANTIALLY COMPLIED WITH.**

**KIM'S ASSIGNMENT OF ERROR NO. IV**

**THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHEN THE AGENCY DID NOT USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS AT REUNIFICATION.**

**KIM'S ASSIGNMENT OF ERROR NO. V**

**THE TRIAL COURT ERRED IN NOT GRANTING MOTHER'S MOTION FOR EXTENDED VISITATION IN AN EFFORT TO EFFECTUATE THE REUNIFICATION.**

**DAVID'S ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO DCJFS WHEN THE STATE'S MOTION FOR PERMANENT CUSTODY WAS UNTIMELY FILED.**

**DAVID'S ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT DID NOT SPECIFICALLY ADDRESS THE FACTORS SET FORTH IN R.C. 2151.414(D)(1) IN GRANTING DCJFS PERMANENT CUSTODY**

## DAVID'S ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO DCJFS WHEN THE PARENTS REMEDIED THE INITIAL CAUSE OF DEPENDENCY AND SUBSTANTIALLY COMPLIED WITH THE CASE PLAN.**

## DAVID'S ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT ERRED IN ADMITTING AND CONSIDERING INADMISSIBLE EVIDENCE OVER THE OBJECTION OF COUNSEL.**

{¶21} For ease of discussion we elect to discuss some of Kim's and David's assignments of error together.

*Kim's third assignment of error and
David's first and third assignments of error*

{¶22} In these assignments of error, Kim and David both challenge the adequacy of the trial court's ruling granting the Agency's motion for permanent custody of M.R.

{¶23} As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3d Dist. Nos. 9–06–12, 9–06–13, 2006–Ohio–4841, ¶ 9, citing *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, supra, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (1991). Thus, it is with

these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the child to the Agency.

**{¶24}** Permanent custody determinations made under R.C. 2151.414 must be supported by clear and convincing evidence. *In re Baby Girl Doe*, 149 Ohio App.3d 717, 2002–Ohio–4470, ¶ 89 (6th Dist.), citing *In re Hiatt*, 86 Ohio App.3d 716, 725 (4th Dist.1993). The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id*., citing *Merrick v. Ditzler*, 91 Ohio St. 256 (1915). In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); *see*, *also*, *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

**{¶25}** "Once a child has been adjudicated dependent, neglected, or abused and temporary custody has been granted to a children services agency, the agency may file a motion for permanent custody * * *." *In re Esparza*, 3d Dist. Nos. 9–

06–25, 9–06–27, 2007–Ohio–113, ¶ 25. In determining whether to grant the agency permanent custody, the trial court must conduct a two-pronged analysis. *In re D.M.*, 3d Dist. Nos. 5–09–12, 5–09–13, 5–09–14, 2009–Ohio–4112, ¶ 31. The first prong requires the trial court to determine, by clear and convincing evidence, whether any of the grounds for permanent custody enumerated in R.C. 2151.414(B)(1) exist. *In re Goodwin*, 3d Dist. No. 17–08–12, 2008–Ohio–5399, ¶ 21. R.C. 2151.414(B)(1) states, in relevant part:

> **the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**
>
> **(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)** **The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.**

{¶26} If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies, then the trial court's analysis proceeds to the second prong which requires the trial court to determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest. In making the "best interest" determination, R.C. 2151.414(D)(1) directs the trial court to consider the following non-exclusive factors:

**(a)** **The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)** **The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)** **The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-**

**month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶27} In the instant case, trial court applied R.C. 2151.414(B)(1)(d) in determining the first prong of the analysis was met and found that M.R. had been in the Agency's temporary custody for twelve or more months of a consecutive twenty-two-month period. On appeal David disputes this finding by the trial court. Specifically, in his first assignment of error, David claims the Agency's motion for permanent custody was premature because at the time M.R. had not been in the Agency's temporary custody for twelve months within the meaning of the statute. David points to the following provision contained in R.C. 2151.414(B) in support of his argument.

**For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.**

{¶28} It is apparent from the record that both the trial court and the Agency calculated the twelve months as commencing sixty days after M.R.'s birth on October 13, 2010—the date when the trial court initially granted the Agency

temporary custody of M.R. However, David argues that the twelve-month period could not have commenced at the time calculated by the Agency and the trial court because M.R. was not removed from "home," as stated in the statute, but instead was removed from Kim's custody when Kim was in prison and when M.R. was in the hospital. David argues that neither a prison nor a hospital constitute a "home."[2] Instead, David contends that the twelve-month statutory period commenced on May 31, 2011, the date of the trial court's adjudication of M.R. as a dependent child, thus twelve months had not elapsed when the Agency's motion for permanent custody was filed on March 20, 2012.

{¶29} The Supreme Court of Ohio has stated the following regarding the overriding purpose of the statutory provisions at issue.

> **The "12 of 22" provisions set forth in R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child.** *See In re K.G.*, 2004-Ohio-1421 at ¶ 19. **Through the "12 of 22" provisions in the permanent-custody statutes, the legislature provides parents with 12 months to work toward reunification before an agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds.** *Id* . at ¶ 21; *In re Workman*, 4th Dist. No. 02CA574, 2003-Ohio-2220, ¶ 40.

*In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 22. Moreover, in enacting R.C. 2151.414(B)(1)(d), it appears that the Ohio General Assembly intended to provide a presumption that a parent who is unable to be reunified with the child

---

[2] Chapter 2151 does not define the term "home."

within the twelve month period is necessarily unable, unsuitable, or unfit to care for the child. *See In the Matter of Workman*, 4th Dist. No. 02CA574, 2003-Ohio-2220, ¶ 39. *See, also, In re Fricke*, Allen App. Nos. 1–02–75, 1–02–76, 1–02–77, 2003–Ohio–1116 ("Once the children have been in custody for 12 of the previous 22 months, the parents are presumed to be unfit and all the trial court must find is that granting permanent custody is in the best interests of the children.").

{¶30} In arguing that the entire purpose of R.C. 2151.414(B)(1)(d) is controlled solely by the construction of the word "home," David essentially urges us to rule that whenever the mother is incarcerated at the time of birth, the "12 of 22" provision of subsection (d) must be tolled as a matter of law until such time as the child is adjudicated abused, neglected or dependent—or the mother is released from prison, given the child back in some sort of "home" context and then has the child removed from that "home."

{¶31} At the outset however, David overlooks the fact that in this case the initiation of the Agency's temporary custody of M.R. was not solely because Kim was incarcerated at M.R.'s birth. Rather, the record demonstrates that Kim had already been approved to participate in a nursery program which would have allowed her *to keep M.R. in her custody* while she finished her prison term. Nevertheless, Kim specifically *declined* this opportunity and *chose* to participate in a program that accelerated her prison term and allowed her to be released early.

Consequently, Kim made the *election* to voluntarily relinquish custody of M.R. and because there was no suitable alternative family placement, the Agency was required to take temporary custody of M.R.

{¶32} Thus as applied to this case, David's argument would essentially permit Kim to use her own criminal conduct and her own election to voluntarily relinquish custody of M.R. to the Agency to extend the time before the presumption of parental unfitness takes effect, thereby extending the time for a parent to demonstrate parental fitness and also forcing M.R. to linger in custodial limbo for an unspecified amount of time quite possibly for a longer period of time than in those instances where a parent is not incarcerated; none of which, in our view, is consistent with the purposes of R.C. 2151.414(B)(1)(d).

{¶33} While we agree with David that one of the competing interests contemplated by the permanent custody statutes is to provide the parents with strict due process guarantees, the parental interest must be balanced with determining what is in the best interest of the child. Therefore, in this case, we conclude that the placement of M.R. outside Kim's custody, which was necessitated at M.R.'s birth by Kim's criminal conduct and incarceration, her voluntarily relinquishment of alternative custody arrangements in the prison system, and the lack of a suitable alternative family placement, all marked the commencement of "the sixty days" for purposes of calculating the twelve-month

period of temporary custody. [3] We further conclude that our interpretation of the statute in this case is both consistent with the overriding purpose of the "12 of 22" provisions and our prior opinion construing of the concept of "home" in *In re M.R. I*, 3d Dist. No. 4-11-12, 2011-Ohio-6528, ¶ 15.[4]

**{¶34}** Accordingly, we conclude that the trial court's finding that M.R. had been in the temporary custody of the Agency in excess of twelve or more months of a consecutive twenty-two-month period at the time the Agency filed its motion for permanent custody was supported by clear and convincing evidence.

**{¶35}** We next move to address the second prong of the analysis and review the trial court's finding that it is in M.R.'s best interest to grant the Agency's motion for permanent custody. The following testimony relevant to this consideration was elicited at the evidentiary hearing.

**{¶36}** Nikki Delaney, the ongoing caseworker from the Agency, testified that the Agency became involved with M.R. upon receiving a phone call from a correctional facility explaining that Kim, a Defiance County resident, had given birth to M.R. and declined to participate in a program that would allow her to keep

---

[3] We note that even if we were to conclude that prison tolled the beginning of the twelve month period to demonstrate parental fitness, the record indicates that in this case Kim was released from prison more than twelve months before the Agency moved for permanent custody.

[4] In *In re M.R. I*, Kim and David appealed the trial court's adjudication of M.R. as a dependent child and also raised an argument regarding the term "home" in the context of the mother's incarceration. However, our prior case the addressed the term "home" in the context of R.C. 2151.419(A)(1), which concerns the Agency's reasonable efforts to prevent the continued removal of the child from the home. Nevertheless, with regard to the "12 of 22" provisions raised here, we believe our ruling is consistent with our prior opinion.

her child while incarcerated. Therefore, the Agency needed to arrange for a legal custodial placement for M.R.

{¶37} Nikki explained that the Agency attempted to place M.R. with Kim's mother, but she declined. At the time, David was not established as M.R.'s father, nevertheless David was not a suitable placement because he was still in high school and he was also involved in an open investigation regarding an alleged rape of a teenage girl. Consequently, on October 13, 2010, the day of M.R.'s birth, the Agency sought an ex-parte order to be granted emergency temporary custody of M.R, which was granted by the trial court the same day. Nikki testified that the foster parents picked M.R. up from the hospital and that M.R. still remained in their care at the time of the permanent custody hearing.

{¶38} Nikki testified that a case plan was developed in March of 2011 and was signed by both parents, who agreed to the goals set forth in the case plan. The case plan goals focused on Kim and David demonstrating an ability to create a stable and safe environment for their family, which included obtaining and maintaining steady employment and housing, attending parenting and budgeting classes, and going to counseling.

{¶39} Nikki testified that Kim failed to obtain employment until March of 2012, a year after the case plan was developed. At the permanent custody hearing, Nikki explained that she did not consider Kim's delayed effort to obtain

employment to be in compliance with the case plan because Kim had yet to demonstrate she can maintain employment for a six month period or longer. Moreover, when Kim was not employed, she failed to complete the required paperwork through the Agency to obtain food stamps, which demonstrated Kim's inability to provide herself with the basic necessities. David on the other hand, was able to obtain and maintain steady employment throughout the pendency of the case. However, Nikki expressed concern with the adequacy of David's income to support his family given the fact that, at the time, he had fathered five children under the age of two with four different women and had child support orders for each of them which resulted in the garnishment of a substantial portion of his paycheck.[5] Nikki's testimony on this point was corroborated by the testimony of Sandra Schappert, the Director of the Defiance County Child Support Enforcement Agency, who testified that as of the permanent custody hearing there were five child support orders for David's dependents and that his total monthly obligation was $1,199.61 and he owed $6,044.00 in arrears.

{¶40} Regarding the counseling requirement, Nikki noted that Kim completed the initial counseling assessment in July of 2011, but only attended five of seventeen scheduled appointments.

---

[5] At the permanent custody hearing in July 2012, Kim was pregnant with the couples' third child due in September 2012.

{¶41} As for other objectives in the case plan, Nikki explained that the Agency arranged for Kim and David to participate in budgeting and parenting classes with an instructor who would come to their home and teach them the appropriate skills. However, Kim and David were "unsuccessfully discharged" from the program after three no call/no shows when the instructor arrived at their home and they were either not at the residence or unwilling to participate in the class at that time. Kim and David's failure to complete the first budgeting and parenting program was confirmed by the testimony of Diana Owens, the instructor, who testified to the couple's absenteeism and neglect in rescheduling appointments. Nikki also recalled referring Kim and David to a second parenting and budgeting program at a pregnancy center, which they also failed to complete. In the meantime, Kim and David had moved from Defiance County to Williams County. Nikki explained that through some difficulty she was able to arrange a third parenting and budgeting program in Williams County for Kim and David to participate in so they could complete the objectives in the case plan. Kim and David eventually completed the budgeting class in January of 2012 and the parenting class in April of 2012.

{¶42} Nikki testified that maintaining stable housing was consistently problematic for Kim and David throughout the Agency's involvement with them. In June of 2011, shortly after M.R. was adjudicated dependent, the Agency found

suitable housing for Kim and David in Defiance County, and agreed to pay the security deposit and two months' rent to help them get established. However, Kim and David failed to pay rent when it became their responsibility to do so. Nikki testified that they were eventually evicted. Nikki's testimony regarding Kim and David's eviction from this home was corroborated by the testimony of Donna Baldwin, the landlord of the property. Donna testified that she "had nothing but problems" with Kim and David while they lived there. Specifically, Donna testified that after the Agency's payments stopped, Kim and David failed to pay any rent. Donna also testified that she was called down to the residence by the police at least twice a week concerning various disturbances reported to law enforcement.

**{¶43}** Nikki testified that after the eviction from the Defiance home, Kim and David moved in with some friends, but were then uprooted again after two weeks when they had an incident with the homeowners. Nikki testified that Kim and David then stayed in two different motels for a week at a time. Incidentally, Kim had just given birth to the couple's second daughter, H.R., during this time. From the motels, Kim and David moved into a trailer in Williams County, which was owned by Kim's family.

**{¶44}** On February 1, 2012, the couple had lived in the trailer for approximately three months when an incident occurred at the home, where in the

midst of a dispute David allegedly threw a lamp at Kim, hitting her in the face and then took three-month-old H.R. from the home. Kim subsequently contacted the Agency and the Williams County Sheriff's office. As a result, H.R. was removed from Kim and David's care and placed in the temporary custody of the Agency in Williams County. Kim was later evicted from the trailer and lived in a homeless shelter for a short period of time. David lived with a friend and eventually found a place to rent in April of 2012. At the beginning of May 2012, Kim again moved in with David. At the time of the permanent custody hearing, Kim and David continued to reside at that location.

{¶45} Nikki also testified that both Kim and David had been in jail during the pendency of the case. Kim was in jail three times, twice due to failure to pay court costs and/or to appear in court, and once for an attempted theft at Wal-Mart. David was in jail once for failure to appear at a pre-trial hearing.

{¶46} With regard to the couples' interaction with M.R., Nikki testified that Kim and David have regularly visited M.R. She also testified that the reason visitations had not been extended was because the Agency was concerned with safety issues. Nikki recalled an incident when the Agency had to call law enforcement during a visitation due to an altercation between David and the visitation monitor, and another time when the Agency had to separate David and another client of the Agency in the lobby. Nikki also recalled that during the

pendency of the case, she had received several notifications of David's and Kim's involvement with law enforcement.

{¶47} Regarding M.R.'s placement in foster care, Nikki testified that she visits M.R. once a month and that M.R. is doing "excellent" in the foster home. Nikki explained that H.R. is also living in the home. In exploring potential relative placements for M.R., Nikki testified that the Agency contacted both Kim's and David's family members. Kim's parents declined and David's mother at one point expressed interest, but after observing M.R. interact with her foster parents, withdrew her consideration because she did not want to disrupt the bond M.R. had with that family. Nikki testified that M.R.'s foster parents are willing to adopt her.

{¶48} Nikki testified that she believes it is in M.R.'s best interest for permanent custody to be granted to the Agency because M.R. has developed a very close relationship with her foster family and Kim and David have failed to maintain stability in their lives by a chronic lack of stable housing and continuous involvement with law enforcement.

{¶49} Tim Stull, Kim's father, also testified for the Agency. He testified that in January 2011 when Kim was released from prison, he and his wife provided Kim with a place to stay in an effort to help her gain custody of M.R. However, Kim's stay at the residence was conditioned on her staying away from David, a condition that Kim broke a month after her release from prison. Tim

expressed that at the time his main concern was that Kim and David were not the same race and he did not believe in the "mixing of colors." Tim stated that he did not again have contact with Kim or David until after H.R. was born in November of 2011, and at that time he tried to put his personal views aside for the sake of his grandchildren. Tim allowed David, Kim and H.R. to live in a trailer owned by his wife. However, their stay ended when Kim and David had the altercation in February of 2012.

{¶50} Tim testified that, on the night of the incident, Kim called and informed him that David had beaten her and took H.R. from the home. Tim recalled seeing a hole in the wall of the trailer and Kim showed him the lamp that she claimed David threw at her. Tim remembered seeing a mark on Kim from where the lamp allegedly hit her. Tim stated that the Sheriff was called to the trailer to investigate and he took Kim to the Agency to retrieve H.R. Tim recalled that when they reached the Agency, Kim changed her story about what had occurred during the altercation and denied David hit her. However, Kim told the same version of events that she relayed to her father to Deputy Ken Jacobs, the Williams County Agency caseworker, and David's mother.

{¶51} Tim testified that after the incident Kim was permitted to live at the trailer so long as David did not stay or come onto the property. However, Kim again chose to be with David and Tim began the process to evict her. Tim stated

that he believes Kim could be a good mother, but she does not know how to protect herself and her children from David and "David comes first." (Tr. at 92).

{¶52} Another witness for the Agency, Kim Jackson, the visitation monitor at the Agency, testified that she began observing Kim and David's visits with M.R. in January of 2011, shortly after Kim's release from prison. Ms. Jackson recalled that Kim and David regularly visited M.R. Ms. Jackson was concerned by Kim and David's propensity to argue in the visitation room. She testified that they initially treated M.R. well, but after H.R. was born they focused their attention more on H.R. than M.R. during the visits. Ms. Jackson also testified that she had problems with David yelling at her during the visits because he was frustrated by the Agency's involvement with his life. Ms. Jackson stated that she observed a strong bond between M.R. and her foster parents, especially her foster father.

{¶53} Deputy Ken Jacobs testified for the Agency and stated that he first encountered Kim on October 8, 2011, when he received a call from dispatch that Kim had called in and stated that she was stranded on the side of the road and needed a ride to a funeral home. Deputy Jacobs testified that when he reached Kim he observed her to be seven or eight months pregnant and crying. He stated that Kim told him that she had been in an argument with her boyfriend and that he

left her on the side of the road. Deputy Jacobs recalled that Kim would not give him her boyfriend's name.

**{¶54}** Deputy Jacobs testified that his next encounter with Kim was on February 1, 2012, when he responded to a dispatch call regarding a domestic situation at Kim's family's trailer. Deputy Jacobs confirmed that David was living in the trailer at the time. Deputy Jacobs recalled meeting Kim at the front door, where she told him that she and David had been in an argument around midnight, a physical altercation had ensued, and David took their three-month-old child, H.R., from the home. Specifically, Deputy Jacobs testified that Kim recounted to him the events that had transpired that night. Kim stated that the argument was sparked by an incident that happened three or four years ago. David picked up a lamp, threw it and struck her. David placed H.R. in her car seat to take her from the home, but she tried to stop him. David then slapped her in the face and left with H.R. Deputy Jacobs observed red marks on Kim's face. However, he recalled that Kim did not want to press charges against David, and that she only wanted the Deputy's help in getting H.R. back.

**{¶55}** Deputy Jacobs located David and H.R. and contacted the Agency in Williams County, which took emergency temporary custody of H.R. He recalled that after speaking with the Agency, Kim decided it would be in her best interest to cooperate with filing Domestic Violence charges. However, Kim continuously

changed her story to the point where Deputy Jacobs did not believe he had the requisite probable cause to make an arrest.

{¶56} Cindy Brinkman, a caseworker with the Williams County Agency, testified for the Agency and confirmed that the Agency became involved with Kim after the alleged domestic violence incident in February 2012. Cindy testified that on the night of the incident she spoke to Kim, who stated that David threw a lamp at her while the baby was in the room, fastened in the car seat. Cindy recalled that throughout the course of their hour-long conversation, Kim changed her story regarding the altercation with David three times that night. Cindy testified that Kim also indicated that David had beaten her throughout her pregnancy with H.R. Cindy testified that as a result of the incident, H.R. was placed in the Agency's temporary custody and sent to live in the same foster home as M.R.

{¶57} Cindy further testified that she had known David since he was a juvenile and that she was involved in placing him in foster care. Cindy recalled that David had a history of aggression issues and was involved in physical altercations on a regular basis. In comparing, the now twenty-year-old David to the juvenile she knew a few years ago, Cindy opined that he was now less willing to accept responsibility for his actions and gets angry very quickly.

{¶58} Another witness for the Agency, Tiffany Kime, the ongoing caseworker for H.R.'s case in Williams County, testified that during Kim and

David's visits with M.R. and H.R., she observed that Kim and David tend to interact more with H.R. and that David did a better job of interacting with M.R. than Kim. Tiffany stated that she believed Kim and David had a stronger bond with H.R. because they lived with her after she was born. Tiffany explained that she addressed this issue with Kim and David.

{¶59} Tiffany also testified that she had observed M.R. at the foster home and noticed that both M.R. and H.R. are very attached to their foster mother. Tiffany confirmed that in her four-month involvement with Kim and David, they had been working on the objectives in the case plan regarding H.R. and regularly attending visitation with both children. However, she explained that the Agency would likely wait until Kim gave birth to their third child to see how the couple handles the stress of the new baby and then assess if they can maintain a stable environment before the Agency considers placing H.R. back in the home.

{¶60} Deborah J.R., David's adoptive mother, provided testimony that she adopted David and his brother when they were eight and nine-years-old. Deborah testified that she was not willing to take custody of M.R. when she was born due to some conflict she had with Kim. However, when M.R. was nine-months-old, Deborah expressed to the Agency that she would be willing to consider taking custody of M.R. As a result, Deborah had visitation with M.R. at the Agency, at her home, and then eventually she began doing overnights visits. Deborah

testified that she felt getting custody of M.R. was no longer a good idea when she observed M.R. with her foster family a month after M.R turned one-year-old, and noticed the strong attachment between M.R and her foster parents. At that point, Deborah felt that "it was the wrong thing to take [M.R] away from the only parents she knew." (Tr. at 209).

{¶61} Deborah also recalled receiving a phone call from Kim the morning after the alleged domestic violence incident during which Kim stated to her that David had beaten her again and took H.R. Deborah remembered Kim telling her that David threw a lamp at her and hit her. She recalled Kim telling her that H.R. was positioned in between her legs when the physical altercation occurred. Deborah testified to her concerns about David and Kim parenting their children; in particular she was concerned with David's anger issues and the fact that Kim knows how to trigger his anger. She also testified that she has not seen a positive change in David over time.

{¶62} Regarding M.R.'s current status in foster care, Mary Werner, M.R.'s foster mother, testified that she and her husband were certified as foster parents in October 2010 immediately prior to M.R. being placed in their care and that M.R. was their first foster child. She testified that they went to the hospital to pick up M.R. after she was born. Mary explained that she and her husband have a twenty-year-old and an eight-year-old daughter in their home and that M.R. "idolizes"

their eight-year-old daughter. She also confirmed that H.R. was placed in her home in February 2012. Mary testified that she would be willing to adopt M.R.

{¶63} Finally, both Kim and David testified. They both denied that there was any physical violence during the February 1, 2012 incident which resulted in H.R.'s removal from their custody. They also both denied that H.R. was present during the altercation. Kim denied stating that David had beaten her through any of her pregnancies. However, Kim did admit she and David lived in nine different places during a seventeen-month period. When asked about being the subject of approximately forty-four different police reports,[6] David simply dismissed the incidents as being targeted because of his race.

{¶64} On appeal, Kim and David do not specifically contest any specific best interest factors relating to the trial court's finding that it is in M.R.'s best interest to grant the Agency's motion for permanent custody. Rather, Kim and David attempt to oversimplify the issue by arguing that the trial court's grant of permanent custody to the Agency is not supported by clear and convincing evidence because the initial causes—Kim's incarceration and David's putative paternity—have been remedied. Kim and David also argue that the trial court erred in granting the Agency's motion for permanent custody because they substantially complied with the case plan.

---

[6] At the permanent custody hearing, David and other witnesses were generally questioned about David's repeated involvement with law enforcement. Several of these police incident reports were made a part of the record, but were not introduced as exhibits at the hearing.

{¶65} At the outset, we note that while the record does indicate that eventually Kim and David completed several of the case plan objectives, they failed to demonstrate that they can maintain an adequate, stable and safe home environment for their family, despite having ample opportunity to do so. On appeal, Kim argues that stable housing was never specifically set out as an objective in the case plan and, therefore, apparently suggests that she should bear no responsibility for her failure to demonstrate that she can provide her child with a stable and safe home. To the contrary, Nikki, the Agency's ongoing caseworker, testified that she verbally addressed the Agency's concerns with Kim and David's unstable housing situation on a continual basis and that the Agency's effort to secure a suitable home, by paying the initial deposit and two months' rent on a home, was further proof of the parties' acknowledgment of this objective.

{¶66} Furthermore, the conditions alleged by the Agency in its complaint which lead to M.R. being adjudicated dependent were that Kim and David were unable to provide M.R. with a home and adequate parental care. *See* 2151.04(A). The evidence in this case demonstrates that not only were Kim and David unable to provide a stable home for M.R., but the evidence also establishes that during the pendency of the case there were multiple allegations of David committing domestic violence against Kim, one of which resulted in the removal of M.R.'s sister from Kim and David's custody. These incidents of alleged domestic

violence combined with the couples' continual involvement with law enforcement, both suggest that Kim and David are still unable to provide a home environment that ensures M.R.'s health and physical safety.

{¶67} Notwithstanding Kim and David's narrow focus on their own efforts in this case, there is ample evidence in the record to support the trial court's decision that it is in *M.R.'s best interest* to grant the Agency permanent custody. The testimony at the permanent custody hearing and the recommendation of the GAL show that M.R. is thriving in her foster home and has a strong bond with her foster parents—the only parents and home she has ever known—and that removing her from that environment would be detrimental to her. The record supports the trial court's finding that Kim and David were afforded more than enough time to demonstrate their parental fitness and that M.R. is in need of a legally secure permanent placement, which M.R.'s foster parents indicated that they are willing to provide through adoption.

{¶68} For all these reasons, we conclude that the trial court's ruling granting the Agency's motion for permanent custody of M.R. was supported by clear and convincing evidence. Accordingly, Kim's third assignment of error and David's first and third assignments of error are overruled.

*Kim's Fourth and Fifth Assignments of Error*

**{¶69}** In her fourth and fifth assignments of error, Kim claims that the trial court erred when it determined that the Agency had used reasonable efforts to reunify her with M.R. Kim also asserts the Agency erred when it failed to grant her motion for extended visitation.

**{¶70}** The Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419; *see*, *also*, *In re Brown*, 98 Ohio App.3d 337, 344 (1994). Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3d Dist. No. 1–01–75, 2001–Ohio–2302. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.* Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck*, 3d Dist. Nos. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 10.

**{¶71}** The evidence at the permanent custody hearing revealed that the Agency made several attempts to assist Kim and David in completing the case plan objectives, which were reasonable and required a minimal effort on Kim and David's part to demonstrate that they can provide for their family's basic needs. Nevertheless, Kim seeks to blame the Agency's budget constraints, which restricted the Agency's hours of operation, for her and David's persistent inability to complete the case plan objectives in a manner satisfactory to the Agency. However, Kim overlooks the fact that despite budget constraints, the Agency still managed to dispense over a $1,000.00 to assist Kim and David in establishing and maintaining a stable, safe home for M.R., but it was Kim and David who lacked the initiative and follow through to continue to pay rent to keep the home.

**{¶72}** Moreover, when Kim and David failed to complete the parenting and budgeting classes, despite having the instructor come to their home, the Agency arranged for them to participate in two more programs, notwithstanding the fact that Kim and David had moved outside the Agency's jurisdiction, which made it more difficult for the Agency to set-up the classes. The Agency also provided Kim and David with transportation to visitations with M.R., but the Agency-sponsored transportation ended when David continued to have altercations with the drivers.

{¶73} Finally, the Agency moved for a six-month extension of temporary custody to allow Kim and David additional time to show compliance with the case plan, which was granted by the trial court. It was only after Kim and David failed to show any progress in demonstrating that they can provide M.R. adequate parental care that the Agency then moved for permanent custody.

{¶74} Kim also complains that the Agency refused to expand her visitations without a court order. However, despite having ample opportunity to do so, Kim did not file a motion requesting extended visitation until a month *after* the Agency filed its motion for permanent custody. Furthermore, the ongoing caseworker testified that the primary reason why visitations with M.R. were not extended was due to the Agency's concern about safety issues in Kim and David's household. There is nothing in the record indicating that these safety concerns had been remedied.

{¶75} Based on the foregoing, we find that the Agency satisfied its duty to diligently pursue efforts to achieve the goals in the case plan. The Agency's case planning and efforts were reasonable and diligent under the circumstances of this case. It is evident that Kim and David's failure to actively meet the objectives in the case plan was through no one's fault but their own. Therefore, we find that the trial court did not err in determining that the Agency had made reasonable efforts to prevent the continued removal of M.R. from Kim and David's custody. We

also find no error in the trial court's decision to not grant Kim's motion for extended visitation. Kim's fourth and fifth assignments of error are overruled.

*Kim's First and Second Assignments of Error and*
*David's Second Assignment of Error*

**{¶76}** In these assignments of error, both Kim and David claim the trial court erred when it failed to make specific findings regarding the statutory "best interest" factors listed in R.C. 2151.414(D) in its judgment entry granting the Agency's motion for permanent custody.

**{¶77}** This Court has previously discussed whether the trial court's failure to specifically address each of the R.C. 2151.414(D) factors in its judgment entry constitutes reversible error and determined the following:

> **[W]e hold that in rendering its judgment, the trial court must** *either* **specifically address each of the required considerations set forth in R.C. 2151.414(D) in its judgment entry,** *or* **otherwise provide some affirmative indication in the record that the court has considered the specific factors listed in R.C. 2151.414(D).**

*In re D.H.*, 3d Dist. No. 9-06-57, 2007-Ohio-1762, ¶ 21. (Emphasis added). In its judgment entry granting the Agency's motion for permanent custody, the trial court stated the following:

> **It is the finding of the Court that permanent custody should be granted to the Defiance County Department of Job and Family Services and that this would be in the best interest of this minor child [Ohio Revised Code Sections 2151.414(B)(1) and Ohio Revised Code Section 2151.414(D)].**

(JE, July 30, 2012 at 4). As we stated in *In re D.H.*, "[a]lthough not expressly required by the statute, the better practice would clearly be for the trial court to recite its findings in the specific terms of the required factors of R.C. 2151.414(D)." *Id.* at ¶ 20.

**{¶78}** Despite the failure of the trial court to specifically enumerate each of the requisite findings, we are nevertheless able to construe from the record that the trial court did provide some affirmative indication that it considered the appropriate factors. Specifically, the trial court cited to R.C. 2151.414 (B) and (D) when it made the finding in its judgment entry that it is in M.R.'s best interest to grant the Agency's motion for permanent custody. While it is far from the better practice, we find that the trial court's citation to the appropriate statute when making its best interest finding meets its obligation, albeit to the minimum extent possible, in demonstrating that the R.C. 2151.414(D) factors were considered. Moreover, as previously discussed, there is clear and convincing evidence in the record to support the trial court's finding that it is in M.R.'s best interest to grant the Agency's motion for permanent custody.

**{¶79}** Kim and David also claim that the trial court was required to enumerate findings regarding the sixteen statutory factors listed in R.C. 2151.414(E), which relate to the specific statutory finding that the child cannot be placed with either parent within a reasonable time or should not be placed with

either parent. *See* R.C. 2151.414(B)(1)(a) and (E). In making this argument, Kim and David insist that, in addition to the "12 of 22" finding pursuant to R.C. 2151.414(B)(1)(d), the trial court was also required to make a finding that M.R. cannot be placed with either Kim or David within a reasonable time or should not be placed with either parent.

**{¶80}** The Supreme Court of Ohio has expressly stated that,

**After H.B. 484's addition of the "12 of 22" provision to R.C. 2151.414, an agency need no longer prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents, so long as the child has been in the temporary custody of an agency for at least 12 months.**

*In re C.W.*, 104 Ohio St.3d at 167, 2004-Ohio-6411, ¶ 21. Consequently, the findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the Agency's motion for permanent custody. *See In re Langford Children*, 5th Dist. No. No.2004CA00349, 2005–Ohio–2304, at ¶ 17.

**{¶81}** As previously discussed, the record supported the trial court's finding that M.R. had been in the temporary custody of the Agency for at least twelve months pursuant to R.C. 2151.414(B)(1)(d). Accordingly, the trial court was not required to make an additional finding that M.R. could not be returned within a reasonable time.

{¶82} Based on the foregoing, Kim's first and second assignments of error and David's second assignment of error are overruled.

### *David's Fourth Assignment of Error*

{¶83} In his fourth assignment of error, David argues that the trial court erred when it admitted certain evidence into the record at the permanent custody hearing. David's argument under this assignment of error pertains to evidence introduced by the Agency which demonstrate: David's anger issues and violent tendencies; the allegation of domestic violence which resulted in the removal of the couples' second child from their home; David and Kim's subsequent involvement with the Williams County Agency; David's numerous and repeated involvement with law enforcement and; David's five child support obligations and his arrearages on those support obligations.

{¶84} Initially, we note that the record reflects that David's counsel failed to object to the admission of this evidence at the permanent custody hearing. It is well established that if a party fails to object at the trial court level, that party waives all but plain error. "A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse effect on the character and public confidence in judicial proceedings." *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982). We do not find that the admission of this evidence rises to the level of plain error.

**{¶85}** Moreover, even assuming *arguendo* that the issue was preserved on appeal, the majority of this evidence involved incidents that occurred during the pendency of the Agency's case and therefore was relevant to the trial court's consideration of whether it is in M.R.'s best interest to grant the Agency's motion for permanent custody. Accordingly, we do not find that the admission of this evidence constitutes reversible error and as such David's fourth assignment of error is overruled.

**{¶86}** For all these reasons, the judgment of the Defiance County Juvenile Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**