[Cite as *In re S.F.*, 2014-Ohio-1792.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:

S.F.,                                          CASE NO.  5-13-36

ALLEGED ABUSED, NEGLECTED
AND DEPENDENT CHILD.                    O P I N I O N

[APRIL CUTRIGHT - APPELLANT].

**Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20123004**

**Judgment Affirmed**

**Date of Decision:   April 28, 2014**

APPEARANCES:

    *Charles R. Hall, Jr.* **for Appellant**

    *Rebecca S. Newman*  **for Appellee**

Case No. 5-13-36

**WILLAMOWSKI, P.J.**

{¶1} Appellant April Cutright ("Cutright") brings this appeal from the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, granting the motion for permanent custody made by Appellee the Hancock County Job and Family Services ("the Agency") and terminating the parental rights of Cutright. For the reasons set forth below, the judgment is affirmed.

{¶2} S.F. was born in 2011 to Cutright and Allen Fraley ("Fraley").[1] On January 12, 2012, the Agency filed a complaint seeking emergency temporary custody of S.F. on the grounds that he was a neglected, abused, and dependent child. Doc. 1. The trial court held a hearing on the complaint on January 13, 2012, and on January 18, 2013, placed S.F. in the temporary custody of the Agency. Doc. 3. An adjudication hearing was held on February 16, 2012. Doc. 9. On February 21, 2012, the trial court entered judgment finding that the child was an abused, neglected, and dependent child. *Id*. On March 13, 2012, the date of the dispositional hearing, the Agency filed a case plan. Doc. 10. The case plan required Cutright to complete the following goals: 1) Keep a safe and stable home environment; 2) Obtain parental education; 3) Obtain a mental health and substance abuse assessment; 4) Follow all recommendations of the Agency and comply with all court orders; and 5) Use the HATS program for transportation. *Id*.

---

[1] Fraley did not appeal the trial court's judgment.

Case No. 5-13-36

The GAL, Darlene Cox ("Cox") filed her recommendation on March 13, 2012, as well.[2]  Cox stated in her recommendation that she had not spoken with the foster parents or seen S.F. personally, so her recommendation was limited to her interactions with Cutright and Agency personnel.  Cox made the following statement in her report.

> **I have had an opportunity to speak with [Cutright] regarding this case.  She is 21 years old and is from a family of eight children that were taken from their mother and father in 2006 and put up for adoption.  Her situation with her adoptive parents, according to her, was less than ideal.  She came back to Findlay after graduating high school and watched her biological father die in 2010.  She does not get along well with her biological mother.  By no means am I making excuses for this young lady for her neglect of this young infant, but I will tell you that the people she depended on for support and advice were very poor choices.  [Cutright] appears to be poorly educated even though she graduated from high school.  Her reading and understanding of what she is reading is minuscule.  When talking with her it appears she is enthusiastic about learning about taking care of S.F. properly and what she can do to improve herself.  Her role models have just been pathetic examples.  [Cutright] wants to get out of poverty and do it without government handouts.  I expressed to [Cutright] that she can be the one to break that cycle in her family if she truly wants to.  She is looking for a job and eventually will get a place of her own.  She is currently living at Hope House.  I also explained to her how important it is for S.F. to be well taken care of and raised with opportunities for a better life than she had.**
>
> **[Cutright's] caseworker at Help Me Grow indicates that April is doing an excellent job with her follow up assignments and learning ways to promote S.F.'s development.  She is also**

---

[2] The record contains no information as to when Cox was appointed as the GAL.

> **learning appropriate ways to interact with S.F. and reasons why he was taken away from her and how to correct those mistakes. She is very good with him and very open with him.**
>
> **Her case worker with Century Health indicates that she passed her mental health and substance abuse assessment with a clean bill of health. She is currently working on living skills where they teach her decision making and how to differentiate between good and bad people. Also important she is learning to function with the dysfunctional background she came from.**

*Id.* at 4. At the dispositional hearing on that same date the trial court, upon the consent of all parties, ordered that S.F. remain in the temporary custody of the Agency. *Id.*

{¶3} On May 21, 2012, the Agency notified the trial court that it wished to grant Cutright unsupervised visits with S.F. Doc. 16. The notice stated as follows.

> **Ms. Cutright has been having supervised visits at Harmony House since January 2012. Ms. Cutright has been compliant with these visits and no concerns have been reported. Ms. Cutright is currently residing in the Hope House at 419 Western Ave Findlay OH 45840.**
>
> **This recommendation is being made due to Ms. Cutright's progress on her case plan. Ms. Cutright has been actively participating in counseling. Ms. Cutright has completed parenting classes, and has three more classes to complete the 'Getting Ahead' program. Ms. Cutright continues to actively look for a job and has been compliant and actively participating in home visits. Ms. Cutright continues to work with Help Me Grow during supervised visitation. Ms. Cutright has recently been referred to an Early Childhood Mental Health worker through Family Resource Center and will be scheduling and starting these visits at the earliest convenience to be held at Hope**

> **House. Unsupervised visits will take place for one hour after these appointments with the Early Childhood Mental Health worker, and continue to increase with positive reports after visits and from service providers.**

*Id*. On July 2, 2012, the Agency filed the semi-annual review of the case plan.

Doc. 23. The review indicated that Cutright was making progress as to her case plan requirements.

> **The Help Me Grow service coordinator reported that [Cutright] is able to interact and respond to [S.F.'s] needs appropriately and demonstrates use of the information in the Parents. As Teachers curriculum during appointments.**
>
> **\* \* \***
>
> **Ms. Cutright continues to reside at Hope House, which she reported to the agency. Ms. Cutright is compliant with chores and there have been no cleanliness or safety hazard concerns reported. Ms. Cutright is currently looking for her own apartment and states that she understands anyone living with her will need a background check. This will continue to be monitored to ensure that Ms. Cutright is able to maintain her own home free of safety hazards and that [S.F.] is not placed around inappropriate or unsafe people.**
>
> **\* \* \***
>
> **Ms. Cutright has utilized HATS, cab service, co-workers, and transportation through Hope House staff at times in order to attend appointments. Ms. Cutright has not reported need for HATS tickets as she has reported she is able to obtain transportation for herself. There have been no reports of Ms. Cutright missing appointments due to lack of transportation, and Ms. Cutright states that she is studying for her permit.**
>
> **\* \* \***

> **Ms. Cutright has participated in all Early Childhood mental Health services and completed parenting classes. There have been positive reports that Ms. Cutright is able to meet [S.F.'s] needs and there have been no reports that [Cutright] has left [S.F.] unattended during these visits or during unsupervised time. * * ***
>
> * * *
>
> **Ms. Cutright has completed a mental health/substance abuse assessment and is compliant with appointments at Century Health. She continues to see Robin Brown twice a month, and there have been no reports of positive drug screens. Ms. Cutright has been compliant with all recommendations made.**
>
> * * *
>
> **Ms. Cutright has been compliant with all appointments with [case worker] and service providers.**

*Id.* at 2-10.

{¶4} On December 10, 2012, the Agency requested a six month extension of temporary custody. Doc. 26. The Agency then filed, on December 27, 2012, a second semi-annual review of the case plan. Doc. 29. The review indicated that some issues were developing with Cutright's progress.

> **Ms. Cutright has maintained her residence at Hope House during this reporting period. There have been no safety hazards observed in the residence during home visits. Reports during visitation indicate that Ms. Cutright has been warned of supervision issues, as well as concerns of Steven's nap and feeding routines. These issues have been discussed with Hope House staff, and CW will continue to receive reports to determine whether they continue to improve.**
>
> * * *

**Ms. Cutright has missed at least one medical appointment due to lack of transportation. Ms. Cutright has not requested any HATS tickets or indicated that she needs rides. Ms. Cutright continues to utilize Hope House staff or CW when these options are available. Reports from service providers indicate that Ms. Cutright has missed or called off work due to lack of transportation, though she has reported that she does not need rides.**

**\* \* \***

**Ms. Cutright has completed parenting class. Ms. Cutright continues to have reports of feeding [S.F.] too much, and needing to be reminded to monitor [S.F.] closely. Reports indicated that Ms. Cutright is able to demonstrate skills that are modeled for her, but struggles to demonstrate them on her own. Further services with maternal mental health or other hands-on parenting resources offered through FRC are being considered to help alleviate these concerns as well.**

**\* \* \***

**[Cutright] continues to attend counseling through Century Health. The latest provider report indicated that the recommendation is for Ms. Cutright to continue counseling to learn how her personal and parenting choices and behaviors impact her own safety as well as [S.F.'s] safety.**

**\* \* \***

**Ms. Cutright continues to increase her unsupervised visitation, however not all case plan services are completed at this time. While progress in [sic] continuing, visits have not progressed to overnights and [S.F.] is not able to return to Ms. Cutright's custody safely.**

*Id.* at 2-7. A hearing was held on January 4, 2013, concerning the Agency's motion to extend temporary custody. Doc. 30. The trial court granted the motion on January 7, 2013. *Id.*

{¶5} On March 5, 2013, the Agency filed a motion to amend the case plan. Doc. 32. Under the amended case plan, Cutright was required to complete the following goals: 1) Participate with service providers and sign releases for S.F. to participate with services to help him achieve developmental milestones; 2) Keep a safe, stable home; 3) Utilize HATS for transportation to appointments; 4) Receive parent education; and 5) Obtain a mental health and substance abuse assessment and follow through with recommendations. Doc. 33. The amended case plan provided that Cutright was entitled to unsupervised visitation for six hours two times a week. *Id.* The trial court ordered that the amended case plan be implemented on March 15, 2013. Doc. 34.

{¶6} On May 14, 2013, the Agency filed a motion for permanent custody of S.F. Doc. 35. The motion alleged that placing S.F. in the permanent custody of the Agency was in the best interest of S.F. because he could not be placed with either parent within a reasonable time and had been in the temporary custody of the Agency for twelve or more months out of a consecutive twenty-two month period. *Id.* The Agency then filed the third semiannual review of the case plan on

June 10, 2013. Doc. 43. The review indicated the following concerning Cutright's progress.

> **Ms. Cutright has attended one appointment with Help Me Grow worker on 3/7/13, and another on 4/5/13. Ms. Cutright had missed the appointment scheduled for 3/28/13. Per reports, Ms. Cutright has not contacted Help Me Grow or returned phone calls to schedule another appointment. [S.F.] currently has no identified cognitive or physical delays.**
>
> **\* \* \***
>
> **Ms. Cutright has complied immediately with service provider recommendations regarding safety including baby-proofing her apartment and setting a TV on the floor when it was unstable on top of a rounded toy chest. The apartment has appeared clean and free from other safety hazards, and Ms. Cutright has followed through with these recommendations.**
>
> **According to service provider reports, Ms. Cutright may be at risk for being evicted due to not paying the portion of rent she is responsible for. CW has been unable to address this with Ms. Cutright as CW has made multiple attempts to contact her and has not had a HV since 4/4/13.**
>
> **Reports indicate that Ms. Cutright allowed unapproved visitors to be present with [S.F.]. At least one report indicated that his [sic] happened the same day after Ms. Cutright was reminded that unapproved visitors would be a violation of the visitation rules and pose a safety threat to [S.F.].**
>
> **\* \* \***
>
> **Ms. Cutright has missed multiple appointments, claiming that she does not have transportation. Ms. Cutright requested HATS tickets once this reporting period, and stated that she has other transportation and will be able to attend appointments. Ms. Cutright has then called CW the same day of appointments requesting transportation. Ms. Cutright has called Century**

**Health to reschedule after missing an appointment, and is now responsible for a late fee.**

**Ms. Cutright states that she is able to walk to most appointments. Ms. Cutright has missed 5 out of 15 visitations that were scheduled at her apartment.**

\* \* \*

**[Cutright] completed the parenting class through FRC. Upon provider recommendation, Ms. Cutright was referred to the Early Childhood Mental Health program. The worker providing Early Childhood Mental Health left FRC and Home Based Therapy was recommended to provide additional hands-on parenting skills training. Ms. Cutright has not followed through to schedule an intake with a home based therapist.**

\* \* \*

**[Cutright] discontinued mental health services since moving into her own apartment in February of 2013, despite recommendations that [Cutright] continue to see a therapist. Ms. Cutright has stated that she does not need transportation, but has no-call/no-showed at least one Century Health appointment and called afterward to try to schedule. Due to multiple missed appointments, Ms. Cutright now has a fee that she has not paid, and has not contacted Century Health to schedule another appointment.**

\* \* \*

**Visitation returned to supervised due to continued safety concerns during visitation, as well as Ms. Cutright's lack of follow through with service providers. Reports indicate that Ms. Cutright is unable to implement skills learned in parenting including leaving [S.F.] unsupervised and having continued to [sic] contact with inappropriate people, and Ms. Cutright has not participated in any services in the month of May 2013. [S.F.] is unable to return to the home safely at this time, and the agency has filed for permanent custody.**

*Id.* at 4-8. On October 15, 2013, the trial court upon its own motion permitted Cox to withdraw as the GAL and appointed Kimberly Freytag Shope ("Shope") as the new GAL.[3]

{¶7} On October 15, 2013, the trial on the motion for permanent custody was held. The Agency presented the testimony of one witness, Katie Stahl ("Stahl"). Stahl testified that she was a caseworker for the Agency and had been since February of 2012. Tr. 11. Stahl testified that S.F. was born to Fraley and Cutright in June of 2011. Tr. 15-16. S.F. entered the custody of the Agency in January of 2012. Tr. 17. Stahl testified that the Agency filed for permanent custody of S.F. on May 14, 2013. Tr. 17. Stahl testified that this meant that at the time of the filing for permanent custody, S.F. had been in the temporary custody of the Agency for approximately fourteen months. Tr. 18. The journal entry for adjudication was filed on February 21, 2012. Tr. 24. Stahl testified that the Agency moved for permanent custody rather than requesting an additional extension

> **because of the services previously offered to [Cutright], there were no other services found to alleviate the safety concerns in the home that we hadn't already tried.**

---

[3] This court finds it unusual that a new GAL would be appointed the day of trial and is curious as to how effective the recommendation could be. Even more unusual is that on November 1, 2013, the trial court on its own motion permitted Shope to withdraw as GAL and appointed Helen Ruhlen as the new GAL. Once again, no explanation for the change was provided. Doc. 63.

> **And since she was on her own was when the safety concerns started to occur, when she wasn't able to get any other services that she had had before.**
>
> **\* \* \***
>
> **Because the concerns were ongoing, we knew that permanency needed to be established sooner rather than later.**

Tr. 30-31.

{¶8} Stahl testified that she had discussed the case plan objectives with Cutright. Tr. 48-49. Throughout the case, the goals and objectives for Cutright have been the same. Tr. 51. The first objective was to have S.F. evaluated by Help Me Grow for delays and to follow through with any recommendations. Tr. 52. Stahl testified that Cutright was compliant with this objective until she moved into her apartment and then she started missing appointments. Tr. 54. Services were suspended in May 2013 for the Help Me Grow program because the health department could not reach Cutright. Tr. 55. However, the services were eventually restarted during visits. Tr. 57.

{¶9} The second objective of the case plan was that she needed to maintain a safe, stable living environment. Tr. 57. The concerns regarding Cutright is that she allowed inappropriate people into the environment. Tr. 58. Stahl testified that Cutright's home was safe and clean. Tr. 59. Previously, Cutright resided at Hope House, which was a transitional house that assists with case management. Tr. 60. She resided at Hope House until February of 2013 when she moved into the

apartment where she resided at the time of the hearing. Tr. 60-61. The apartment was safe and appropriate for a two year old and there was no known risk of eviction. Tr. 61. However, the people that Cutright allowed in the home were not safe. Tr. 62. Stahl testified that the Agency has received several reports of people with "a history of either sexual offenses or child abuse, neglect" and "multiple unknown people" that were permitted in the home. Tr. 62. This concerned the Agency because Cutright did not see it as a safety concern. Tr. 62. The man that Cutright listed on facebook as being in a relationship with her had previously been convicted of a sexual offense against a juvenile. Tr. 62, 64. After learning about the relationship, Stahl discussed it with Cutright. Tr. 67.

> **I discussed that obviously that's a big concern as part of the case plan. That he has a history of being on the sex offender registry – he's currently on the registry for sexual offenses against a juvenile. And that's when she said she didn't feel like he would do anything to [S.F.], didn't see it as a problem because he was never actually in the apartment with [S.F.].**
>
> **The Court: So she didn't deny the relationship?**
>
> **A. She did agree that there was a relationship. That she has met him at the library is the explanation that she gave.**
>
> **Q. Okay. Did she say whether they were dating or that they had any extensive relationship or this was just someone that she knew?**
>
> **A. She said that they had been talking briefly, is how she put it. They were in a relationship briefly and they were no longer in a relationship since she had found that out.**

Tr. 67-68. Additionally, Cutright was the victim of domestic violence in her apartment in June of 2013. Tr. 69. Cutright and her boyfriend at the time had been arguing when he came at her and put his hand in her mouth, stretching it to the point that her tonsils needed to be removed. Tr. 70. As a result of her injuries, Cutright required hospitalization. Tr. 70-71. Stahl testified that she learned of this incident a few days later when Cutright informed her that she had moved to Open Arms shelter after leaving the hospital. Tr. 71. Cutright told Stahl that she was afraid to return to her apartment at that time. Tr. 72. Cutright has since obtained a restraining order against her assailant and charges are pending. Tr. 73. Stahl testified that she had concerns that Cutright was not telling her about adults who were staying at her apartment as required by the case plan. Tr. 75. In Stahl's opinion, Cutright had not addressed the concerns about providing a safe and stable living environment for S.F. Tr. 77.

{¶10} The third objective of the case plan which related to Cutright was that Cutright would either find transportation or utilize transportation services to use the provided services. Tr. 79-80. Stahl testified that Cutright did utilize this service, but was not consistent in doing so. Tr. 81. Cutright "missed quite a few appointments with not being able to use that transportation." Tr. 81.

{¶11} Cutright's fourth objective was to complete parent education. Tr. 83. Cutright was to complete the class and to demonstrate the proper care of S.F. Tr.

84. Cutright did complete the classes. Tr. 85-86. Cutright was no longer working with the parent educators, though there was continuing concern with her ability to apply the skills she learned. Tr. 87-88. After the classes were complete, Stahl received reports that Cutright was feeding S.F. too much and that Cutright did not seem to know how to play with S.F. Tr. 88. On another instance, Cutright was holding S.F. while cooking and S.F. burned his hand. Tr. 90.

{¶12} The next objective for Cutright was for her to obtain substance abuse and mental health assessments. Tr. 92. This was done due to Cutright's history as a maltreated child. Tr. 92. Cutright completed the assessment and counseling was recommended. Tr. 94. Cutright had been diagnosed with an adjustment disorder and a learning disorder. Tr. 94. In Cutright's case, counseling was recommended on a monthly basis. Tr. 95. Up until April of 2013, Cutright was compliant with this requirement, but was then discharged administratively for failing to pay an outstanding fee. Tr. 95. Cutright was consistently compliant with the case plan while she lived at Hope House, but once she got her own apartment, she started missing appointments and becoming noncompliant. Tr. 96.

{¶13} Cutright was also required to cooperate with the Agency and the service providers. Tr. 101. Generally, Cutright was cooperative. Tr. 102. However after the Agency filed for permanent custody, Cutright stopped responding to Stahl's calls. Tr. 102-103. Cutright has been attending group

counseling at the domestic violence shelter on a voluntary basis without a request from the Agency. Tr. 107. According to the progress report from the women's support group, Cutright was compliant with the requirements of that program. Tr. 108. Although the Agency did not require it, Stahl testified that this was a good thing that Cutright had voluntarily chosen to participate in this counseling. Tr. 109.

{¶14} Stahl further testified that Cutright had been granted weekly visitation of two hours with S.F. Tr. 110. The staff at Harmony House had no major concerns during the visits.[4] Tr. 111. There were minor concerns that Cutright seemed uncomfortable interacting with S.F. and did not know what to do when he cried. Tr. 111-12. In April of 2012, Cutright was granted unsupervised visits with S.F. Tr. 112. Although the visits were unsupervised, there was a level of supervision since she was at Hope House and service providers routinely stopped in during the visits. Tr. 112-13. The unsupervised visits continued until April of 2013. Tr. 113.

> **Q. That's kind of a long period of time to have unsupervised visits but not move into a reunification/protective supervision situation. Explain to the Court why that is.**
>
> **A. Again, along that time, that was when we received the reports of [S.F.] falling, that Ms. Cutright needed a lot of support. She was able to make most of her appointments and**

---

[4] Although Cutright was staying at Hope House, Harmony House is the name of the entity that monitors the visitation and works with the residents of Hope House.

> **she was complying with everything, but she wasn't able to hold a job or manage the schedule.**
>
> **And I had spoken with the case manager at Hope House several times. And she said she was concerned with Ms. Cutright being able to care for [S.F.] full time by herself.**

Tr. 113-14. Once the visits moved to Cutright's apartment, she started missing visits. Tr. 117. Of the fifteen visits scheduled, Cutright was not home when the foster parents brought S.F. to her apartment on five different occasions. Tr. 118. At the same time, Stahl received reports that unapproved visitors were at the apartment during the visits. Tr. 119. Additionally, Stahl received a report of Cutright falling asleep during the visit, which allowed S.F. to get into the baby wipes. Tr. 121. A second incident occurred when S.F. burned his hand because Cutright was holding him while cooking macaroni and cheese. Tr. 121. The injury to S.F. was minor, was treated with cold water by Cutright and needed no medical follow up. Tr. 121-22. Based upon all of these issues, the decision was made in April of 2013 to terminate unsupervised visits. Tr. 123. Since that time, there were no major incidents or safety concerns during supervised visitations. Tr. 123. Stahl testified that in her opinion, Cutright could not provide an adequate, permanent home for S.F. Tr. 127.

> **Q. Can you describe [S.F.'s] relationship with his mom?**
>
> **A. His biological mother?**
>
> **Q. Yeah. With [Cutright].**

**A.** **They seem to interact appropriately. He is anxious and upset before he meets her and then kind of calms down.**

**Again with the limited visits, it's kind of a longer time in between when they can see each other, especially for a young child.**

**When visits were the twice a week for six hours, he seemed more comfortable with the routine of going and spending more time with her and then kind of the routine changed again.**

**So it kind of seems to be a source of anxiety, especially recently, that visits have been – gone back to supervised. It's kind of a source of anxiety to see her and kind of not know what needs she'll be able to meet.**

Tr. 128-29.

**Q.** **Can you describe for the Court what [S.F.'s] relationship is with his foster parents?**

**A.** **He is very bonded with his foster parents. He goes to them immediately for comfort or help and they're able to meet his needs and calm him down and provide whatever emotional or material need he might have.**

Tr. 130. Stahl testified that it would be in S.F.'s best interest for permanent custody to the Agency for adoptive placement. Tr. 134. Stahl testified that the foster parents had expressed an interest in adopting S.F. Tr. 138.

{¶15} On cross-examination, Stahl testified that the Agency could have extended temporary custody for an additional six months and continued to work with Cutright. Tr. 145. Cutright had cooperated with the Agency by signing the necessary releases and participating in the case plan services. Tr. 147. Stahl

testified that Cutright's apartment had no safety concerns and was appropriate for a child. Tr. 147. There was no threat of eviction from the apartment. Tr. 148. Throughout the case plan, the only unapproved person in the home that Stahl had personal knowledge of was a female friend of Cutright. Tr. 148. Stahl admitted that the male sex offender who had been in a relationship with Cutright never met S.F. Tr. 149 Stahl reiterated that once she told Cutright of the man's status as a sex offender, Cutright terminated the relationship. Tr. 149. After the domestic violence incident, Cutright cooperated with the police to seek a protection order and sought safety at a domestic violence shelter. Tr. 150. Cutright ended that relationship as well. Tr. 151. Stahl admitted that the mental health treatment center was probably not the right facility to address the learning disability. Tr. 152. Stahl also admitted that it is not uncommon for first time mothers to not know what to do when parenting. Tr. 152.

{¶16} After the testimony of Stahl, the Agency rested its case. The only other person to testify was the GAL.[5] The GAL testified that she had spent a total of approximately fifteen hours on the case and had a chance to meet the child. Tr.

---

[5] This is the same GAL that was appointed the day of trial, though she did prepare the report that was received by the trial court prior to trial. No explanation was provided as to why the change in GAL was made. This court notes that the GAL did not meet the minimal guidelines of meeting with the parents. See Sup.R. 48(D)(13). Other than speaking with Agency personnel and the foster parents, the GAL merely read the record provided by the Agency. While this is understandable due to the short time frame, it does not lend itself to allowing the GAL to maintain independence and objectivity as suggested by Sup.R. 48(D)(2). This court also notes that the last minute change of the GAL is not isolated to this case alone, but has been seen in at least one other case from the same trial court. These changes do raise questions of the constitutional right of confrontation since this GAL cannot speak to the basis of the opinions as she is merely reporting what others have told her and not from her own knowledge. However, since this was not raised as an assignment of error, we will not address it at this time.

158-59. The GAL testified that she recommended that permanent custody of S.F. be granted to the Agency. Tr. 160. No relevant questions were asked of the GAL. A review of the report indicates that the GAL had contact with S.F., Stahl, the prosecuting attorney, the attorneys for the parents, the foster parents, and the Agency supervisor. Ex. A, 3. There was no contact with Cutright before making the recommendation. The recommendation in the report stated as follows.

> **A last visit should be scheduled of [Cutright]. * * ***
>
> **Permanent custody should be granted to [the Agency] giving them the ability to place [S.F.] for adoption.**

*Id*. at 6. The parties then made closing arguments and the trial was concluded.

{¶17} On October 21, 2013, the trial court granted the Agency's motion for permanent custody. Doc. 59. Cutright filed her notice of appeal from this judgment on November 12, 2013. Doc. 65. On appeal, Cutright raises six assignments of error.

### First Assignment of Error

> **The trial court's decision to terminate [Cutright's] parental rights and grant permanent custody to [the Agency] is against the manifest weight of the evidence.**

### Second Assignment of Error

> **The trial court erred in granting permanent custody for [S.F.] because it was not in his best interest.**

**Third Assignment of Error**

**The trial court erred in granting permanent custody to [the Agency] because [the Agency] failed to develop and implement a case plan reasonably calculated to achieve the goal of reunification of the minor children.**

**Fourth Assignment of Error**

**[The Agency] failed its duty to use reasonable case planning and diligent efforts at reunification with [Cutright].**

**Fifth Assignment of Error**

**[The Agency] did not have make [sic] a good faith effort to reunify [Cutright] with S.F.**

**Sixth Assignment of Error**

**The trial court erred in granting permanent custody of [S.F.] to [the Agency] because clear and convincing evidence was not presented to establish that S.F. could not be returned to [Cutright] within a reasonable time.**

{¶18} The first, second, and sixth assignments of error are closely related and will thus be addressed together. The right to raise one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990) . "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. When considering a motion to terminate parental rights, the trial

court must comply with the statutory requirements set forth in R.C. 2151.414.

These requirements include, in pertinent part, as follows.

> **(B)(1)  Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **\* \* \***
> **(a)   The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in [2151.413(D)(1)], the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **\* \* \***
>
> **(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**
>
> **For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from home.**
>
> **\* \* \***

**(C) In making the determination required by this section * * *, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section * * * but shall not be submitted under oath.**

R.C. 2151.414. Pursuant to this statute, an Agency is not required to prove that the child could not or should not be returned to the parents within a reasonable time if the child has been in the temporary custody of the Agency for twelve out of a consecutive twenty-two month period of time. R.C. 2151.414(B)(1)(d), *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶21. If this situation is proven, the Agency need only prove that it is in the best interests of the child, as set forth in R.C. 2151.414(D), to grant the motion of the Agency for permanent custody. *In re M.R.*, 3d Dist. Defiance No. 4-12-18, 2013-Ohio-1302, ¶ 26.

{¶19} A review of the record in this case shows that S.F. was adjudicated as dependent, neglected, and abused on February 21, 2012. This is less than 60 days after the removal from the home, so is the date to be used when calculating the twelve out of twenty-two months. R.C. 2151.414(B)(1)(d). The motion for permanent custody was filed on May 14, 2013. Thus, S.F. was in the temporary custody of the Agency for almost fifteen months out of a consecutive twenty-two month period of time. Since the Agency has shown by clear and convincing

evidence that the requirements of R.C. 2151.414(B)(1)(d) have been met, the trial court need only determine whether the granting of permanent custody to the Agency was in the best interest of S.F. The sixth assignment of error is overruled.

{¶20} When making a determination of the best interest of a child in a motion for permanent custody, the trial court must consider the factors set forth in R.C. 2151.414(D).

> **(D)(1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:**
>
> **(a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;**
>
> **(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414.

{¶21} Here, the trial court stated that it had considered the statutory factors and found that it was in S.F.'s best interest to grant the Agency's motion for permanent custody.  Doc. 59, 2.  Specifically the court stated as follows.

> **[T]he court has considered the lack of relationship of the child with his parents, relatives, foster parents, out-of-home providers and other people who may significantly affect the child's need for legally secure permanent placement and the probability that this type of placement cannot be achieved without granting Permanent Custody to [the Agency].  The court further has considered the custodial history of the child along with the wishes of the child (child is age 2) as expressed to the court by way of recommendation from his CASA.**
>
> **In determining the best interest of the child this court has considered that mother failed to participate in the Help Me Grow Program as required by her case plan.  She did fairly well while living at the Hope House but her situation deteriorated when she moved to her own apartment.  According to her Facebook page she formed a relationship with one Elliot Emmons who has a conviction for a sexual offense against a juvenile and is a sexual offender registrant.  In addition, while living in her apartment there was a domestic violence incident where the assailant pulled open her mouth so violently it required the surgical removal of her tonsils.  The caseworker has had difficulty monitoring the activities of mother since she is rarely at home. * * * The CASA states that she believes it would be in the child's best interest to grant his permanent custody to the agency.  This court agrees. (CASA Exhibit A).**

Doc. 59, 2-3.  A review of the record shows that there was testimony by the case worker that although Cutright and S.F. had a relationship, it caused anxiety to S.F. due to the constant changes.  Stahl also testified that S.F. was very bonded with the foster family who had expressed an interest in adopting him.  There were no

other relationships, except S.F.'s relationship with Fraley, discussed during the testimony. R.C. 2151.414(D)(1)(a). The child was too young to express an opinion, but the GAL recommended granting the Agency's motion for permanent custody. R.C. 2151.414(D)(1)(b). There was testimony given that the child, who was two years old at the time of the hearing, had been in the temporary custody for the majority of his life and for more than twelve consecutive months. R.C. 2151.414(D)(1)(c). Stahl testified that the constant switching between foster parents and Cutright was causing the child to be anxious and that he needed stability. Stahl also testified that the only way for that to occur was for the Agency to be granted permanent custody and to place S.F. in an adoptive home. R.C. 2151.414(D)(1)(d). The factors as set forth in divisions (E)(7) to (11) of R.C. 2151.414 were not applicable and did not need to be addressed. None of the above evidence was contradicted at trial. Based upon the evidence before it, this court cannot find that the trial court abused its discretion in determining that the granting of the Agency's motion for permanent custody, thus terminating Cutright's parental rights, was in the best interest of S.F. There was competent and credible evidence presented by the Agency, which if believed, would show by clear and convincing evidence that parental rights should be terminated. The first and second assignments of error are overruled.

{¶22} In the third, fourth, and fifth assignments of error, Cutright argues that the Agency did not make a good faith effort to reunify the children with her and failed to make a case plan which could sufficiently do so.

> **Case plans are tools that the Agency uses to set forth the goals of the parents to allow for the return of the children to their parents.** *Leveck*, *supra* at ¶10.  **These plans must take into consideration the individual circumstances of each case, including the abilities of the parents and the children.** *Id*. **"Nevertheless, the issue is not whether there was anything more that [the Agency] could have done, but whether the [Agency's] case planning and efforts were reasonable and diligent under the circumstances of this case."** *Id*.

*In re. C.E.*, 3d Dist. Hancock Nos. 5-09-02, 5-09-03, 2009-Ohio-6027, ¶15.  In *C.E.*, this court held that the Agency had not made a case plan in good faith when the father had completed all of the case plan objectives, only to be told that he needed to do more, although the additional requests were not made a part of the case plan, but were merely suggestions.  The father in *C.E.* had progressed to the point of having unsupervised weekend visits at the time the hearing for permanent custody was held showing that significant progress had been made.  Additionally, the Agency in that case moved for permanent custody on the grounds that the father had not complied with the case plan and admitted that he had successfully complied with all of the requirements of the case plan.  This is different than the case before us now.

{¶23} Here, Cutright was required to apply the knowledge she had learned in parenting classes and to provide a safe and stable home environment. The testimony was that although Cutright had completed the parenting classes and was cooperating with the service providers, she was not applying the knowledge appropriately. Stahl testified that she was still receiving reports of Cutright allowing S.F. to be out of her sight and unsupervised at times.[6]. Additionally, Stahl testified that Cutright did not think about preventing incidents, but instead merely handled them when the harm was done. Her example of this was that when S.F.'s hand was burned, Cutright focused on how she correctly handled the situation by treating the burn rather than on how she could avoid it in the future. Stahl also testified that Cutright did not see the potential harm that could befall S.F. by her bad choices in men, such as the sex offender and the boyfriend who physically assaulted her to the point of landing her in the hospital. The reports from the supervised visits indicated that Cutright was not comfortable in her role as a mother.

{¶24} Stahl also testified that Cutright was not complying with the portion of the case plan requiring her to provide a safe and stable home. Stahl personally knew of one instance when a stranger was staying at Cutright's apartment, but Cutright failed to notify the Agency so that a background check could be

---

[6] These reports were not that S.F. was left home alone for long periods of time, just that she did not always keep a close eye on him. One of the reports is that during one of the visits, Cutright fell asleep and awoke to find that S.F. had gotten the baby wipes out and was playing with them.

completed. Stahl was informed by third parties that this had happened on other occasions as well. Although Cutright's apartment had no physical safety issues and was appropriate for a small child, Stahl was concerned with the people who were allowed in the home.

{¶25} Cutright was also required to participate in counseling as recommended by the service provider. Stahl testified that Cutright had missed counseling appointments and was terminated when she failed to pay the outstanding missed appointment fees. Although Cutright had indicated that she would return to counseling, she did not do so. Given the undisputed evidence, this court cannot find that the Agency did not implement a case plan reasonably calculated to reunify Cutright with S.F. This court also cannot find that the Agency did not make a good faith effort to try and reunify mother and child. The third, fourth, and fifth assignments of error are overruled.

{¶26} Having found no error prejudicial to the Appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas, Juvenile Division, is affirmed.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**