[Cite as *In re B.D.*, 2020-Ohio-1005.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTERS OF: | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| B.D. | : | Hon. Craig R. Baldwin, J. |
| I.D. | : | Hon. Earle E. Wise, J. |
| O.D. | : | |
| W.D. | : | Case Nos. 19CA000032  19CA000039 |
| L.D. | : | 19CA000033  19CA000040 |
| E.D. | : | 19CA000034  19CA000041 |
| | : | 19CA000035  19CA000042 |
| | : | 19CA000036  19CA000043 |
| | : | 19CA000037  19CA000044 |
| | : | |
| | : | NUNC PRO TUNC |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Guernsey County Court
                                  of Common Pleas, Juvenile Division,
                                  Case No. 18JC259

JUDGMENT:                         Affirmed

DATE OF JUDGMENT:                 May 26, 2020

APPEARANCES:

For Plaintiff-Appellee Guernsey Co          For Defendant-Appellant C.D.
Children Services

                                            JEANETTE M. MOLL
MELISSA M. WILSON                           Jeanette M. Moll LLC
274 Highland Avenue                         PO Box 461
Cambridge, Ohio 43725                       Zanesville, Ohio 43702

For CASA                                    For Defendant-Appellant L.D.

MARGARET BOYD LAPLANTE                       WESLEY JOHNSON
139 W. 8th Street                            1360 E. 9th Street, #910
Cambridge, Ohio 43725                        Cleveland, Ohio 44114

Guardian Ad Litem

RUTHELLEN WEAVER
542 S. Drexel Avenue
Columbus, Ohio 43209

*Baldwin, J.*

{¶1}   Appellant C.D. and appellant L.D. appeal from the October 22, 2019 Journal Entry of the Guernsey County Court of Common Plea, Juvenile Division, terminating their parental rights and   granting permanent custody of their children to Guernsey County Children Services.

## STATEMENT OF THE FACTS AND CASE

{¶2}   Appellant C.D. is the biological father of B.D. (DOB 1/28/2006), I.D. (DOB 10/29/2007), O.D. (DOB 3/20/2009), W.D. (DOB 6/20/2013), L.D. (DOB 11/4/2014), and E.D. (DOB 5/26/2017) while appellant L.D. is the biological mother.  On June 27, 2018, a complaint was filed alleging that the children were neglected and/or dependent children. On June 26, 2018, the trial court had issued an ex parte order of custody of the children to Guernsey County Children Services (hereinafter "GCCS").

{¶3}   Following a probable cause hearing at which appellant C.D. failed to appear, the trial court found that there was probable cause to believe that the children were dependent and continued them in the temporary custody of GCCS. The children were adjudicated dependent on August 23, 2018 and placed in the temporary custody of GCCS. As memorialized in a Journal Entry filed on September 18, 2018, the trial court, following the dispositional hearing, ordered that temporary custody of the children remain with GCCS.

{¶4}   Review hearings were held on December of 2018 and, March of 2019 and an annual review was held on June of 2019.

{¶5}   On August 22, 2019, GCCS filed a Motion to Modify Dispositional Orders, seeking permanent custody of the children. A hearing was held on October 10, 2019.

{¶6}   At the hearing, Dr. Aimee Thomas with Lighthouse Family Center testified that she was a psychologist and conducted psychological evaluations with appellants "with an emphasis on parenting strategies." Transcript at 7. She testified that she was a licensed professional counselor and licensed psychologist. Dr. Thomas testified that she performed parenting evaluations on both appellants on April 22, 2019 and that both appellants were cooperative

{¶7}   Dr. Thomas testified that the primary concerns with appellants were over unstable housing and chronic substance abuse. She testified that appellants tested positive for drugs that they were not prescribed and struggled in establishing housing. According to her, appellant C.D. admitted to ongoing use of marijuana and sporadic use of alcohol "with an open case plan, and while participating in treatment at Allwell." Transcript at 12. When asked about her concerns with appellant C.D., Dr. Thomas testified as follows:

{¶8}   A.   There was no doubt of [appellant C.D.'s] love for his children, but there were concerns with his ability to provide a stable and safe environment with them in terms of housing.  It appeared based on his reports and [appellant L.D.]'s reports that when his mother was alive, she was a stabilized (sic) force for him, and likely a support system from what I gathered from their disclosures.

{¶9}   They had lived independently for a couple years before becoming displaced again, so housing was their primary problem.  Another issue for [appellant C.D.] is he appeared to be in a significant amount of pain.  He experienced stenosis, degenerative back disorder, legitimate pain and he appeared to me to be in pain.  He acknowledged that at points that the pain was so debilitating that he would be in bed all day.  And my

concern with that is that he would become somewhat incapacitated. That was a source of concern to me because his wife also abused illicit drugs, and certainly if you want to provide care for a two year old, it would be important to be aware and alert of what's going on in the environment.

{¶10} The ongoing use of marijuana was also a source of concern at the time of the clinical interview. If you're prescribed Suboxone, which assists with an opiate addiction, it would be contraindicated to be ingesting other illicit drugs. I did advise him to explore an alternative with regard to pain management, including a medical marijuana card.

{¶11} However, the concern with a marijuana card with [appellant C.D.] is that his wife also uses marijuana. My concern is that she may have difficulty with her sobriety if he continued to use marijuana even it was deemed medically necessary.

{¶12} Transcript 12-13.

{¶13} Based on her psychological evaluation of appellant C.D., Dr. Thomas recommended that he continue to participate in substance abuse treatment and enter residential treatment if he was unable to maintain his sobriety. She also recommended that he begin attending two 12- step meetings a week and actually work the 12 steps, which he had not done in the past, and that appellant C.D. consult with a pain management program to address his chronic pain and that he participate in individual counseling to "identify his obstacles for maintaining his sobriety and establishing his stability". Transcript at 14. At the time that she met with appellant C.D., he was receiving SSI benefits and she was concerned that he had not yet established housing with the income that he had.

{¶14} Dr. Thomas was also questioned about appellant L.D. She testified that appellant L.D. told her that she previously had been diagnosed with bipolar disorder, but that her review of medical records showed that appellant was diagnosed with major depressive disorder and generalized anxiety disorder instead. She testified that appellant L.D. had significant childhood abuse and trauma and started used marijuana at the age of seven in order to cope with trauma, so she never learned to cope with life. She testified that she diagnosed appellant L.D. with "major depressive disorder and generalized and other specified personality disorder in addition to substance abuse disorders." Transcript at 16. Appellant, according to her, also "described abusive use of Benzodiazepine, opiates in the past when she was prescribed Suboxone in 2009." Transcript at 16.

{¶15} Dr. Thomas testified that she recommended that appellant L.D. participate in substance abuse treatment services including group counseling  and the ongoing use of Suboxone and that she participate in a residential substance abuse program if she still used marijuana despite treatment at Allwell. She also recommended that appellant L.D. attend 12-step meetings and participate in comprehensive mental health treatment services to address substance abuse and mental health disorders, and participate in weekly individual counseling to develop healthy coping skills. Dr. Thomas also recommended a psychiatric evaluation. Dr. Thomas testified that she recommended that appellant receive the support of in-home parenting after reunification occurred. She indicated that she thought it would be beneficial for appellant L.D. to obtain part-time employment and recommended that both appellants have financial resources to support their family.

{¶16} On-cross-examination, Dr. Thomas tested that appellant L.D. had reported participating in treatment at Allwell and that the treatment was focused more on substance abuse than mental health. She testified that appellant L.D. would need years of treatment to deal with her emotional problems.  Dr. Thomas admitted she only met with appellants once and that on such date, appellant C.D. appeared to be uncomfortable due to pain.

{¶17} The next witness to testify was Kelsey Wolfe, the kinship program coordinator with GCCS.  She testified that she received kinship referrals from the family in the case. While numerous kinship options were explored, none were found to be appropriate due to concerns about child welfare history, criminal history or lack of interest.

{¶18} Amanda Kennedy, a caseworker at GCCS, testified that she had been the ongoing caseworker in this case since receiving the case in July of 2018. She testified that the agency became involved over concerns that 12 people were living in the house of appellant C.D.'s sister, over concerns about drugs and concerns that the children were not being taken care of.  Appellants failed drug screens on May 1, 2018 and tested positive for Gabapentin and marijuana.

{¶19} Kennedy testified that appellant C.D.'s sister, with whom they were living, called them to tell them that she was not able to keep up with caring for six additional children as well as her own and asked for respite, which the agency could not provide. The agency looked at other family members for a safety plan and contacted appellant for names. At the time, appellant C.D. was in jail for a failure to appear for a traffic violation and appellant L.D. was living at a campground in a tent and did not have service for them to reach her. The children, according to her, had been in foster care before through Perry

County in 2016 due to drug concerns and were in care from February 11, 2016 through July 28, 2016. The following is an excerpt from her testimony:

**{¶20}** Q. Okay. Had there been other concerns with any child welfare agency in the State of Ohio besides when they were in foster care?

**{¶21}** A. So the family does have history through Perry County, Muskingum County, and Guernsey County with a lot of the similar concerns for why we're involved. There's always been housing concerns.

**{¶22}** There's always been drug concerns, children being neglected and having severe lice. One of the intakes was they had lice so bad that their heads were bleeding. There was some more drug concerns, more housing concerns.

**{¶23}** At the time that [L.D.] was born, [appellant L.D.] positive for various drugs throughout her pregnancy, tested positive for THC. [L.D.] was not tested because she had to be taken to Akron Children's. [E.D.] was also born and tested positive for cord tissue.

**{¶24}** Transcript at 36-37.

**{¶25}** Kennedy testified that appellant L.D.'s case plan required her to complete a drug and alcohol assessment and follow all recommendations. She testified that appellant L.D. had been diagnosed with severe opioid use disorder and had consistently attended weekly appointments at Spero Health. Appellant L.D. had tested positive for fentanyl and norfentanyl. Appellant L.D. also had been required to comply with random drug screens and the refusal to do so would be considered a positive for all substances. While appellant L.D. had not been prescribed Gabapentin, she tested positive for such drug. She also tested positive for THC, amphetamine and methamphetamine among

other drugs. The next objective was for appellant L.D. to complete a mental health assessment and follow all recommendations. Appellant L.D. completed her assessment at Allwell and was diagnosed with major depressive disorder, anxiety disorder, reaction to severe stress and opioid dependence. Kennedy testified that it was recommended that appellant had outpatient core therapy, which is a type of vocational employment assistance; case management medication, and family therapy upon the return of the children plus parenting classes and substance abuse. Appellant L.D. had denied the core part of the recommendation and was not compliant with her services. Appellant L.D. completed the assessment on October 2, 2018. Appellant did not call or appear for an appointment on October 16, 2018 and canceled her next appointment on March 25, 2019. On March 27, 2019, appellant L.D. failed to call or appear and on April 24, 2019 she kept her therapy. She was to meet with a nurse on April 29, 2019, but did not call or show. Appellant L.D. kept appointments on May 6, 2019, June 5, 2009, June 12, 2019 and June 19, 2019. Kennedy testified that appellant L.D. received a domestic violence charge in in Perry County and was ordered to undergo anger management while this case was pending. Appellant L.D. had not had any type of counseling since June 19, 2019 and had not returned to Allwell for mental health counseling.

{¶26} Kennedy next testified that appellant L.D. was to complete a parenting assessment at Northeast Behavioral Health, which is now Lighthouse Family Center, and follow all recommendations. Kennedy met with appellants at the end of July of 2018 to go over their parenting assessment and the recommendations. Appellant L.D. did not want to discuss her assessment and was not in agreement with the results. Kennedy testified that appellant L.D. had not continued working with comprehensive mental health

treatment services as recommended, but that she continued going to her substance abuse treatment.   Appellant L.D. had been receiving counseling at Spero Health for drug and alcohol and goes back every week to get her Suboxone prescription filled. Kennedy admitted that the agency continued providing appellant L.D. with Suboxone even though she had positive screens. She testified that appellant L.D. did not obtain employment.

**{¶27}** From July of 2018 until May of 2019, appellants had been essentially homeless and staying in a tent. In May of 2019, they bought a house on land contract which needed some remodeling and repair work. The agency paid the $150.00 water deposit for the house. Kennedy testified that appellants were still at the house as of the time of the hearing and that they paid $450.00 a month. The house, according to Kennedy, showed improvement, but there was no sink in the bathroom and the toilet appeared to be full of feces. Kennedy indicated that she was concerned about cleanliness. She testified that appellants had obtained a working refrigerator and stove and that there were holes in some of the floors and the ceiling leaked in a bedroom. She testified that there had been improvements since she first went in, but that work still needed to be done to make the house suitable for the children.

**{¶28}** When Kennedy went back to the house in July, they talked about income. At the time, appellant C.D. was receiving $750.00 a month in disability and voiced concerns that they did not know how they were going to be able to pay the rent and pay child support. As of the hearing, appellant L.D. was unemployed and was not attending mental health services.

**{¶29}** Kennedy testified that appellant C.D. had been diagnosed with severe opioid disorder and was attending weekly outpatient services. He was discharged at the

end of October of 2018 from Spero Health because he did not bring his Suboxone to his appointments and tested positive for fentanyl.   Appellant C.D. then went to First Step Recovery where he was still engaged and would have completed an assessment there on November 7, 2018. He was diagnosed there with opioid use disorder, hypnotic use disorder, cannabis use disorder and amphetamine use disorder and attended weekly appointments. Kennedy testified that she was notified in August that they increased appellant C.D.'s level of care at the end of July to do individual outpatient counseling three times a week, and that appellant was not compliant with that.   Appellant C.D. tested positive for fentanyl and norfentanyl.

{¶30} Kennedy testified that appellant C.D. completed his mental health assessment at Allwell in October of 2018 and they diagnosed him with adjustment disorder and moderate opioid use disorder and recommended individual outpatient and family therapy upon return of the children, parenting classes, and substance abuse disorder counseling. Records showed that he did not accept outpatient therapy and had not returned for further serves. He had scheduled appointment on March 25, 2019 and March 27, 2019, but did not call or show up for either.  Appellant C.D. had not had mental health treatment during the pendency of this case and had not participated in an intensive substance abuse treatment program as recommended. Kennedy further testified that appellant C.D. was not in agreement with the whole parenting assessment because he was upset that appellant L.D. did not qualify for the medical marijuana card while he did. He indicated that he did not have time for the NA/AA meetings and the 12-step meetings even though he was not employed.

**{¶31}** Kennedy testified that the children were bonded with appellants, and loved their parents. She testified that a family support specialist who had supervised visitations had come to her a couple to times with concerns that appellants might be under the influence, but that appellants had not tested for anything other than what they usually tested for. She admitted that they usually tested for THC, which was an illegal substance, and that, therefore, they were under the influence.

**{¶32}** Kennedy testified that the younger two children were both in counseling and on medications for "like ADHD and behaviors" and that one of the children was getting tested for autism and another continued having testing done because they thought she was diagnosed with a form of dwarfism, but the doctors thought that the dwarfism was a side effect of another disease. Transcript at 68. She also was having speech therapy because at two years old, she only said a few words. I.D. and O.D. had been in the same foster home since they first came into care and loved it there. B.D. was in one foster home for just days, but he moved in July of 2018 to another foster home that he loved. He told Amy, the foster mother, that he wanted to stay there forever and not return home. W.D. and L.D. were in a foster home from June 26, 2018 to January 3, 2019 but were moved because of allegations of abuse and neglect against another child and placed into the same foster home as B.D. and were still there. While W.D. and L.D. had behavioral issues, they seemed to have gotten better. E.D. was at the same foster home as B.D. for a few days before they were moved to another foster home where they currently were. She loved her current foster home, and was bonded with her foster parents and called the foster mother "Mom" and the foster father "Babe." Transcript at 70. B.D., W.D., L.D.,

and E.D. were in the same foster home and I.D. and O.D. were in another foster home together.

{¶33} When asked what concerns she had for the parents that the agency believed hindered reunification at that time, Kennedy noted that there had not been any behavioral changes, that the drug screens still showed positive for illegal substances and that the house was not ready and still needed a lot of work.  She testified that she did not believe that if given additional time, appellants could reunify with their children because "[w]e have given them—we're coming close to a year and a half, and they have not made the necessary changes as of this day." Transcript 72.  Both parents only had a few negative drug screens.  The following testimony was adduced when Kennedy was asked what reasonable efforts the agency made to prevent removal of the children from their home:

{¶34} A.  We had a safety plan in place, attempted to make contact with the parents before filing for custody.  Was not successful.  Since I have worked with them, I have made referrals for services.  We have provided visitation.  We did help them pay for the water deposit to move in to their house.  We have paid for their parenting assessments, and we have searched for kinship.

{¶35} Q.  Has the agency also facilitated visitation between the parents and the children?

{¶36} A. Yes.

{¶37} Q. And what is the agency requesting today?

{¶38} A.  We are requesting permanent custody of all six children.

{¶39} Q. To Guernsey County Children Services?

**{¶40}** A. Yes.

**{¶41}** Q. Does the agency believe that to be in the best interest of the children?

**{¶42}** Yes.

**{¶43}** Q. And is that for the reasons you've already given as far as the concerns of the parents?

**{¶44}** A. Yes.

**{¶45}** Transcript at 72-73.

**{¶46}** On cross-examination, Kennedy admired that improvements and repairs had been made to the house and that all the necessary appliances were working in the house. She testified that appellant C.D. had told her that in terms of his chronic pain, marijuana was helping more than the other pills had and he told about getting a medical marijuana card. Appellant L.D. would not have qualified for a card. She admitted that other than some reports of appellants possibly being under the influence, there had been no other concerns about their appropriateness with the children at visits. She also admitted that appellants were always positive for only the things that they typically tested positive for which, in appellant L.D.'s case, was usually THC and Suboxone.

**{¶47}** Kennedy testified that the foster parents had told her that the children were saying that appellants were promising them that they could come home, but testified that the visitor monitor did not report hearing that said. She testified that appellants were following their drug and alcohol counseling but not their mental health counseling and had not followed recommendations. She did not believe given more time that they would follow through. She further testified on cross-examination that the majority of the work on the house was cosmetic and that she would not put any child there because of visible holes

in the floor and leaking ceiling in the bedroom. She testified that the washer and dryer were not hooked up and that appellants needed to get a sink in the bathroom and the ceiling fixed in the back bedroom. She admitted that the agency did not have a problem with appellant C.D. testing positive for his prescriptions and that she did not believe that given additional time, appellants would be able to make additional progress on their case plan.

**{¶48}** On cross-examination, Kennedy testified that appellant C.D. tested positive for fentanyl or norfentanyl on April 3, 2019 and April 5, 2019 and tested positive for fentanyl again on June 25 2019 and July 9, 2019 tested positive for norfentanyl. She agreed that appellants had gone more times to the Suboxone clinic than for the drug screens. She also tested that there appeared to be mold on the floor of the house. Appellant L.D. was charged with domestic violence against appellant C.D. while this case was pending.

**{¶49}** Ruthellen Weaver, the Guardian Ad Litem ("GAL") testified that she filed a report on October 1, 2019 and that she recommended that the court grant permanent custody to the agency because the children needed permanency. She noted that appellants had to deal with chronic pain, poverty, a history of trauma for appellant L.D. and that they had not completed their case plans. She believed that it would be unlikely that additional time would make a difference and agreed that appellants had made little progress. The GAL noted that appellants had a prior opportunity to work with Perry County Children Services and had, in that case, received reunification about four months in. She testified that she spoke with the older children and that they did not wish to be reunified and were very happy where they were and were very attached and bonded to their foster

families. When asked, she testified that she had not seen motivation from appellants since the time they were served with the permanent custody notice to try and start working on their case plan.

**{¶50}** Julia Dowling, the court-appointed special advocate ("CASA") testified that she filed a report on September 27, 2019 and recommended that the court grant permanent custody of the children to GCCS. She testified that it was in their best interest because the children were getting the mental and physical care that they needed. She testified that the doctors had suggested that L.D. be tested for autism and that, according to doctors, testing was not done but now that L.D. was in foster care, she was going to be tested, and that E.D., when she was born, had fluid on her brain and that, according to doctors, was not followed up on until they got involved when E.D. was a year old. B.D. was fearful of being returned to his parents and then put back into care again.

**{¶51}** The trial court, pursuant to a Journal Entry filed on October 22, 2019, terminated appellants' parental rights and granted permanent custody of the six children to GCCS.

**{¶52}** Appellant C.D. now raise the following assignments of error on appeal:

**{¶53}** "I. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**{¶54}** "II. THERE WAS NOT CLEAR AND CONVINCING EVIDENCE FOR THE TRIAL COURT TO FIND THAT THE MINOR CHILDREN SHOULD NOT BE PLACED WITH APPELLANT AND THAT IT WAS IN THE CHILDREN'S BEST INTEREST TO BE

PLACED THE PERMANENT CUSTODY OF GUERNSEY COUNTY CHILDREN'S SERVICES."

{¶55} Appellant L.D. raises the following assignments for error on appeal:

{¶56} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

{¶57} "II. THERE WAS NOT CLEAR AND CONVINCING EVIDENCE FOR THE TRIAL COURT TO FIND THAT THE MINOR CHILDREN SHOULD NOT BE PLACED WITH APPELLANT AND THAT IT WAS IN THE MINOR CHILDREN'S BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF GUERNSEY COUNTY CHILDREN'S SERVICES."

{¶58} "III. APPELLANT WAS DENIED CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE HEARSAY TESTIMONY OF GCCS SOCIAL WORKER TO THE RECORDS FROM THE SPERO HEALTH WHOSE REPRESENTATIVE WAS UNABLE TO ATTEND TRIAL."

{¶59} "IV. THE TRIAL COURT IMPROPERLY RELIED UPON THE RECOMMENDATIONS OF THE GAL WHO MISSTATED THE LAW IN HER TESTIMONY AT TRIAL ON PERMANENT CUSTODY WHEN SHE INDICATED THE BEST INTERESTS OF CHILDREN IS AS WARDS OF COURT AND THAT THAT IS SECURED BY GRANTING PERMANENT CUSTODY TO GUERNSEY COUNTY CHILDREN'S SERVICES BOARD."

Appellant C.D.s' First & Second Assignments of Error & Appellant L.D.'s First & Second Assignments of Error

{¶60} In both appellants' first assignment of error, they contend that the trial court's decision that the best interests of the children would be served by granting permanent custody of the children to appellee is against the manifest weight and sufficiency of the evidence. In their second assignments of error, appellants challenge the trial court's finding the children could not be placed with appellants within a reasonable time or should not be placed with her. We elect to address both assignments of error together.

{¶61} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* Stark App. No. CA5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶62} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶63} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court

determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶64} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶65} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶66}** If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

**{¶67}** The trial court's analysis of the best interests of the children is guided by R.C. 2151.414(D) which states:

**{¶68}** In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

**{¶69}** (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

**{¶70}** (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

**{¶71}** (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive

twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

**{¶72}** (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.

**{¶73}** The findings issued by the trial court reflect a close consideration of all of the factors listed in this section of the Code.

**{¶74}** There was testimony in the matter that the children were bonded to their parents and loved them, but that they needed permanency and were bonded to and loved their foster parents. Despite seven possible kinship options, none were found to be appropriate. There was testimony that the children wished to remain in foster care and did not want to be returned home. The children had been in the temporary custody of the agency since June 26, 2018, I.D. and O.D. were in the same foster home and the other four children had been in two different foster homes. Both the Guardian Ad Litem and CASA recommended that permanent custody be granted to the agency because it was the children's best interest. In addition, there was testimony that appellants might be under the influence at visitation.

**{¶75}** As is stated above, appellants also challenge the trial court's finding under R.C, 2151.414(B)(1)(a) that that children could not placed with appellants within a reasonable period of time.

**{¶76}** "[T]he findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, [and] each is independently sufficient to use as a basis to grant

the Agency's motion for permanent custody." *In re M.R.,* 3rd Dist. Defiance No. 4-12-18, 2013-Ohio-1302, ¶ 80. Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive twenty-two-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.,* 3rd Dist. Marion Nos. 9-13–43, 9–13–44, and 9-13-45, 2014-Ohio-1136, ¶ 30, citing R.C. 2151.414(B)(1)(d); *In re A.M.*, 3rd Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 14.

**{¶77}** The trial court, in this case, found that the children had been in the temporary custody of the agency for 12 or more months of a consecutive 22 month period. The children, as noted by the trial court, at the time of the hearing, had been in the continuous custody of the agency since June 26, 2018. Appellants had not contested such finding.  In addition, there was testimony, as set forth above, that appellants had not remedied the drug, mental health and housing concerns that led to the removal of the children. Neither appellant was employed and he only assistance that they received was from SSI payments. Appellants had not complied with their case plans.

**{¶78}**  Appellant C.D's. and appellant L.D's first and second assignments of error are, therefore, overruled.

Appellant L.D.'s Third Assignment of Error

**{¶79}**  Appellant L.D., in her third assignment of error, contends that she received ineffective assistance of counsel when trial counsel failed to object to hearsay testimony from a GCCS social worker relating to records from Spero Health whose representative was unable to testify at trial.  The testimony related to drug test results.

**{¶80}** Appellant's counsel did not object to the admission of the testimony as inadmissible hearsay.  This failure to object waives all but plain error. Notice of plain error applies only under exceptional circumstances to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978) paragraph three of the syllabus. Plain error does not exist unless it can be said that but for the error, the outcome of the trial would have clearly been otherwise. *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 58 (1990).

**{¶81}** In *In re T.V.,* 10th Franklin Dist. No. 04AP–1159, 2005–Ohio–4280, the court held that a caseworker's testimony during a permanent custody proceeding regarding the mother's positive drug tests constituted inadmissible hearsay, where the lab reports of the drug screens were not admitted into evidence. In this case, the certified lab reports  were admitted into evidence as exhibits

**{¶82}**  Appellant L.D.'s third assignment of error is, therefore, overruled.

Appellant L.D.'s Fourth Assignment of Error

**{¶83}**  Appellant L.D., in her fourth assignment of error, asserts that the trial court improperly relied on the recommendation of the Guardian Ad Litem who misstated that law on permanent custody.

**{¶84}**  Appellant L.D. specifically takes issue with the following statement made by the Guardian Ad Litem on the record:

**{¶85}**  "My report states that I believe these children require permanency, and the best way for them to have permanency is as wards of the Court by granting permanent custody to the Guernsey County Children Services. " Transcript at 115.

**{¶86}** According to appellant, "[t]he assertion by the GAL is not the law of Ohio with respect to permanent custody and the effects of granting a motion for the same." There is, however, no evidence that the trial court applied the incorrect law in ruling on the motion for permanent custody.

**{¶87}** Appellant L.D.'s fourth assignment of error is, therefore overruled.

**{¶88}** Accordingly, the judgment of the Guernsey County Court of Common Pleas, Juvenile Division, terminating appellants' parental rights and granting permanent custody of their children to Guernsey County Children Services is affirmed.

By: Baldwin, J.

Gwin, P.J. and

Wise, Earle, J. concur.